CHESAPEAKE BAY FOUNDATION, INC. and Citizens Against the Refinery's Effects, Inc., Plaintiffs,

v.

VIRGINIA STATE WATER CONTROL BOARD et al., Defendants.

Civ. A. No. 77–0376–R.

United States District Court, E. D. Virginia, Richmond Division.

July 29, 1980.

Patrick M. McSweeney, McSweeney, Stutts & Burtch, Richmond, Va., Bruce J. Terris, Washington, D. C., Betty C. Higginbotham, Staff Atty., Chesapeake Bay Foundation, Annapolis, Md., for plaintiffs.

Norman Olitsky, Portsmouth, Va., Steven Lieberman, City Atty., and Stuart E. Katz, Asst. City Atty./Portsmouth, Portsmouth, Va., for intervening defendants.

Frederick S. Fisher, Asst. Atty. Gen., Gerald L. Baliles, Richmond, Va., J. Michael Hines and John Feore, Washington, D.C., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, Chesapeake Bay Foundation, Inc. ("Chesapeake Bay") and Citizens Against the Refinery's Effects ("CARE"), instituted this action to challenge the issuance of a discharge permit to the Hampton Roads Energy Company ("HREC") by the Virginia State Water Control Board ("State Board").

Plaintiffs are non–profit organizations dedicated to conservation and environmental protection. Chesapeake Bay is a Maryland corporation which owns property adjoining the Chesapeake Bay. Its members enjoy that body of water for fishing, swimming, boating and other activities. CARE is a corporation organized under the laws of Virginia. CARE's membership consists primarily of residents of the Tidewater section of Virginia. CARE members claim to enjoy the use of the Chesapeake Bay and other navigable waters relevant to this action.

Defendant State Board is an agency of the Commonwealth of Virginia. Regulating the discharge of pollutants into the state's waters is one of the State Board's responsibilities.

Defendant HREC is a Delaware corporation. HREC intends to construct a petroleum refinery and marine terminal at Portsmouth, Virginia. In order to operate the refinery, HREC is required to obtain a National Pollutant Discharge Elimination System permit. HREC sought and obtained that permit and it is the validity of its issuance which is the focus of this action.

The United States of America and Douglas M. Costle, Administrator of the United States Environmental Protection Agency ("EPA") were originally joined as defendants in this action. They were dismissed by orders of February 28 and June 28, 1978. Dismissal was prompted by the Court's reasoning that the federal defendants either were not responsible for the conduct complained of or that their actions were beyond the review of this court.

By order of November 11, 1977 the Court permitted the City of Portsmouth, Virginia and The Hampton Roads Building and Construction Trades Council to intervene in this action as defendants. The City of Portsmouth, Virginia is a municipal corporation and it actively solicited the construction of the HREC facilities within its jurisdiction. Hampton Roads Building and Construction Trades Council is an affiliation of labor organizations whose membership would purportedly benefit from construction of the refinery and marine terminal.

Jurisdiction over the subject matter of this action is claimed under 28 U.S.C. § 1331. Each of the parties have moved for summary judgment, representing to the Court that there is no genuine dispute of material fact. The parties have filed exhaustive memoranda in support of their respective positions. The Court, on March 20, 1980, solicited supplemental memoranda regarding specific issues, and those memoranda have been submitted. The Court also

entertained the oral argument of counsel on several occasions. The matter is thus ripe for disposition.

The HREC permit is a national pollutant discharge elimination system ("NPDES") permit which was issued by the State Board. The Federal Water Pollution Control Act ("the Act") was amended in 1972 to allow the states the opportunity to obtain NPDES permitting authority. The Act contains a general prohibition of pollutant discharges except in accordance with an NPDES permit.

HREC applied for its NPDES permit on October 19, 1976. The refinery is expected to discharge approximately 466,000 gallons of treated effluent into the Elizabeth River each day. HREC hopes to process 175,000 barrels of oil daily at the refinery. In addition to the effluent, it has been estimated that 0.01% of the crude oil and refined petroleum processed by the refinery will be spilled into the Elizabeth River during shipping and handling.

The HREC application was initially considered by a special task force created by the State Board. The task force was composed of representatives of several state agencies, including The Virginia Institute of Marine Science. On November 11, 1976, the State Board issued a draft permit which was based upon the task force's evaluation of HREC's application.

A public hearing on the draft permit was held in Portsmouth, Virginia on December 9, 1976. Over 700 persons attended the hearing. Approximately fifty persons addressed the State Board, including, *inter alia*, State Board staff members, HREC representatives, residents of Portsmouth and representatives of the plaintiffs. The State Board advised those in attendance that it would accept additional written comments until January 4, 1977.

Representatives of the EPA also appeared at the Portsmouth hearing. The EPA conveyed its position as not objecting to the issuance of the draft permit. The State Board was formally advised of the EPA's position on January 28, 1977.

The State Board considered the HREC application at its January 31, 1977 meeting.

No action was taken at that time. The State Board again convened on February 18, 1977. At this second meeting the State Board considered and approved an oil spill condition which was to be incorporated into the draft permit. The draft permit, as amended, was then approved by the State Board.

The oil spill condition requires HREC to submit an acceptable plan for the prompt containment, clean–up and removal of oil spills associated with the refinery. HREC may not discharge pursuant to the permit until after the oil spill plan is approved by the State Board. The permit imposed other conditions upon HREC's discharge, as well: There is an absolute prohibition of any discharge in violation of the state's water laws. The permit requires HREC to install a waste treatment system utilizing an ultra-violet ozonation process. HREC must also permit the State Board staff to review the treatment performance on a continuing basis.

On March 16, 1977 the plaintiffs petitioned the EPA to exercise its right to veto the HREC permit. The plaintiffs then indicated their intention to seek judicial relief if the EPA's position remained unchanged. Plaintiffs filed this action on June 30, 1977.

Plaintiffs' claims II, III and IV survive the previously addressed motions to dismiss. In claim II plaintiffs allege that the State Board violated the Act, and its own and the EPA's regulations by failing to ensure that the refinery's discharge will not exceed the total maximum daily pollution loads for the Elizabeth River. Claim III asserts that the record does not contain substantial evidence to support the State Board's conclusion that the discharge will not violate the applicable water quality standards. Plaintiffs' claim IV contends that the State Board's procedures violated federal and state law, the Fourteenth Amendment to the United States Constitution and the EPA's regulations.

## THE NPDES PROGRAM

The Act's 1972 amendments constituted a significant change in both the strategy and

method for controlling and eliminating water pollution. After 1972 the Act no longer placed primary emphasis upon ambient water quality. Pollution control strategy began to focus, instead, upon the components and amounts of discharge into navigable waters. The method of enforcement was consequently altered, as well. A violation could now be determined by monitoring individual discharges rather than having to discover an offending point source.

The NPDES program was adopted as the primary means of implementing the Act's effluent limitations and standards of performance and to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibited any person from discharging pollutants into navigable waters except in accordance with an NPDES permit.

The EPA was initially entrusted with the responsibility for issuing NPDES permits. Congress did envision a major role for the states in the water pollution control effort, however. *See, e. g.,* 33 U.S.C. § 1251(e). This is especially clear from the consideration of 33 U.S.C. § 1370 and 33 U.S.C. § 1342. The former section explicitly recognizes the rights of the states to adopt more stringent pollution control measures than those found in the Act. The latter section, which is § 402 of the Act, is particularly persuasive of the important role of the states. Section 402(b) provides that the states may assume the EPA's role in the NPDES permit–issuing process. It is difficult to read § 402 without concluding that, "Congress clearly intended that the states would eventually assume the major role in the operation of the NPDES program". *Shell Oil Company v. Train,* 585 F.2d 408 (9th Cir. 1978).

The first step in obtaining NPDES authority is for the state to submit a proposed permit program to the EPA. If the proposed program satisfies § 402's requirements, the Administrator must give it his approval. *Save the Bay, Inc. v. Administrator of EPA,* 556 F.2d 1282, 1285 (5th Cir. 1977), *reh. den.* 560 F.2d 1023 (1977). The EPA must thereafter cease its NPDES permit–issuing activities within ninety days. 33 U.S.C. § 1342(c). A state's administration of an NPDES program is indicative of Congress' intent to "recognize, preserve and protect the primary responsibilities and rights of states to prevent, reduce, and eliminate pollution . . . ." 33 U.S.C. § 1251(b).

Once a state has assumed NPDES authority, the EPA's role is largely supervisory. The EPA has a *review* function in that the state must submit NPDES permit applications to the Administrator for his consideration. The Administrator may, within ninety days prevent the issuance of a permit by exercising his veto, 33 U.S.C. § 1342(d); or, the Administrator may acquiesce in a permit's issuance; which decision is totally discretionary and unreviewable. *Mianus River Preservation Committee v. EPA,* 541 F.2d 899, 907 (2d Cir. 1976); *Chesapeake Bay Foundation, Inc. v. United States,* 445 F.Supp. 1349, 1353 (E.D.Va. 1978). EPA may, however, waive the notification requirement and its right to object to particular categories of permits. 33 U.S.C. § 1342(e) and (f). The EPA's *oversight* function refers to its continued supervision of a state program to insure compliance with the Act's requirements. If a state program proves to be inadequate or poorly administered, etc., the EPA may withdraw its earlier certification. 33 U.S.C. § 1342(c)(3).

The Act, in general, and the NPDES program, in particular, thus join the state and federal governments in a "delicate partnership" endeavoring to control and eventually eliminate water pollution. *Save the Bay, supra* at 1284. The permitting process under § 402(b) is, for the most part, undeniably a state program. *District of Columbia v. Schramm,* No. 78–2209 (D.C.Cir.1980). The state character of an approved NPDES program is so strong, moreover, that the state's assumption of that responsibility is not viewed as a delegation of federal authority. H.R.Rep.No.95–830, 95th Cong., 1st Sess. 3 (1977), *reprinted in* U.S.Code Cong. & Admin.News, pp. 4424, 4479 (1977) ("House Report").

Like many other states, Virginia has been certified to administer its own NPDES program. *See* 40 Fed.Reg. 20129 (May 8, 1975). In the instant case the Court must consider whether the federal district courts are available to challenge the issuance of an NPDES permit by a state and, if so, whether the HREC permit was lawfully issued.

## JURISDICTION

The United States Court of Appeals for the Fourth Circuit has characterized the Act as "poorly drafted and astonishingly imprecise." *E. I. duPont deNemours & Co. v. Train,* 541 F.2d 1018, 1026 (4th Cir. 1976), *aff'd. in part, rev'd. in part,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). The difficult questions under the Act include even the most fundamental issues, *e. g.* subject matter jurisdiction.

The Court's difficulty . with the jurisdictional question in the instant case is amply demonstrated by the course of this litigation. In *Chesapeake Bay Foundation, Inc. v. United States,* 445 F.Supp. 1349 (E.D.Va. 1978), the Court dismissed the claims presently under consideration for lack of subject matter jurisdiction. Upon plaintiffs' motion, the Court reconsidered the dismissal and vacated its previous order. The Court then determined that 28 U.S.C. § 1331 conferred jurisdiction upon the district courts to consider whether the State Board had satisfied the Act's "minimum federal guarantees for NPDES permits." *Chesapeake Bay Foundation, Inc. v. United States,* 453 F.Supp. 122, 127 (E.D.Va.1978).

The Court has remained concerned about the jurisdictional issue, however, as evidenced by its March 20, 1980 letter to counsel. At the Court's request, supplemental memoranda were filed on this point and additional argument was heard. Plaintiffs suggested that the Court's difficulty was not related to a jurisdictional question but was, instead, a doubt as to the existence of a cause of action to support plaintiffs' claims.

■ The Court is of the view that plaintiffs' characterization is well taken. The Court has consistently viewed the problem as one of determining the proper role of the district court in the Act's NPDES scheme. In short, the Court was cognizant and respectful of the state character of Virginia's NPDES program. Nevertheless, upon a review of the memoranda and the cases cited therein, the Court has concluded that federal–question jurisdiction exists under 28 U.S.C. § 1331.

Defendants have argued, and the Court agrees, that the jurisdictional question presented in this action must be narrowly drawn. The question presented may be stated as whether the district courts, pursuant to 28 U.S.C. § 1331, possess jurisdiction to entertain a challenge to the issuance of an NPDES permit by a state agency. The Court is of the view that the issue must be considered in this context so as to give due respect to the state character of the NPDES program.

Defendants have cited to the Court several cases which addressed jurisdictional issues under the Act. The Court is not persuaded that those cases are dispositive of the instant case, however. The dicta quoted by defendants provide that state–issued NPDES permits constitute state, not federal, action. From this defendants would have the Court deduce that no substantial federal question is presented in a challenge to the issuance of a state permit. The difficulty with that conclusion is that it need not be inferred from even that dicta. Three of the cases cited by defendants involved the jurisdictional effect of the Administrator's action or inaction. *See Mianus, supra; Shell Oil Company v. Train,* 585 F.2d 408 (9th Cir. 1978); *Save the Bay, supra.* Other cases addressed whether the Circuit Courts of Appeal or the District Courts were the appropriate forum for reviewing the Administrator's actions. *See Crown Simpson Pulp Company v. Costle,* 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980) *(per curiam); DuPont, supra.* While the dicta is persuasive in another context, *see infra,* the Court is of the view that it does not preclude the jurisdictional basis claimed by the plaintiffs.

Defendants further contend that the only "minimum federal guarantees" relevant to

the NPDES program are the requirements of § 402 of the Act, 33 U.S.C. § 1342. Subsection (b) of that section sets forth the elements which must be contained in a state program if it is to gain the EPA's approval. Thus, defendants argue, the only "minimum federal guarantee" is that the state program is and remains qualified under § 402(b). *Mianus, supra* at 906 (the Act's minimum standards are attained by the EPA's promulgation of standards and the review and oversight of the Administrator to insure state compliance with those standards.)

The Court cannot agree that the Act's sole "minimum federal guarantee" is that the state program be structured in accordance with § 402(b). Such a conclusion would elevate form over substance. The Act necessarily requires that the state program be administered in accordance with the federal requirements. Indeed, that is the subject of the EPA's oversight function. 33 U.S.C. § 1342(d)(2). Plaintiffs contend that the issuance of the HREC permit violated the Act's requirements in several respects. The allegations would thus necessitate an interpretation of a federal statute which is the heart of jurisdiction under 28 U.S.C. § 1331. *See, e. g. Oneida Indian National v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1973).

The Court is aware of but one decision reaching the jurisdictional issue in the context in which it is presented here. In *District of Columbia v. Schramm, supra*, the District sought injunctive relief from the issuance of an NPDES permit by an agency of the State of Maryland. In considering the existence of an implied cause of action in favor of the District, the court stated, "we believe we have jurisdiction on this question under 28 U.S.C. § 1331 (1976)." *District of Columbia v. Schramm, supra* at ——, n.15. *See also, National Sea Clammers Association v. City of New York*, 616 F.2d 1222 (3rd Cir. 1980) (federal question jurisdiction will support an action stated under the Act's savings clause, 33 U.S.C. § 1365(e). *Cf.,* Currie, *Judicial Review under Federal Pollution Laws*, 62 Iowa L.Rev. 1221, 1227–28 (1978) (Congress did not anticipate federal review of state permitting

decision and if there is review, jurisdiction more properly lies in the circuit courts of appeal.) While *District of Columbia v. Schramm* did not set forth the court's reasoning, this Court agrees with its conclusion.

## IMPLYING A CAUSE OF ACTION UNDER THE ACT

[*] The Act does not explicitly provide a federal cause of action in favor of persons seeking to challenge a state agency's decisions regarding NPDES permit applications. Plaintiffs have not stated a contrary proposition. Rather, plaintiffs contend that such a cause of action is implicit in the statutory scheme. As heretofore indicated, the Court has reviewed the memoranda submitted by the parties and the cases cited therein, and is guided as well by the recent decision in *District of Columbia v. Schramm, supra*. For the reasons hereafter stated, the Court concludes that a federal cause of action as asserted by plaintiffs is not implicit in the Act.

The Court is aware that a federal cause of action may be implicit in a statute in which Congress has not provided such a right explicitly. *See e. g., J. I. Case Company v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Whether a statute permits an implication of a federal cause of action depends upon the legislature's intent. *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). Of course, Congress' intent is not always easy to discern. Accordingly, the Court's efforts must be to perceive that intent by considering those factors which would, presumably, have influenced the Congress. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) four such factors were enunciated. The mode of analysis suggested in that case is the following:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted"–that is, does the statute create

a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted). The Court now considers those four factors.

The Court is of the opinion that the first inquiry must be resolved in plaintiffs' favor. The Act was intended to restore and maintain the integrity of the Nation's navigable waters. This goal would obviously benefit the public generally. Plaintiffs' members, however, enjoy the recreational uses and aesthetic value of the Chesapeake Bay. This is over–and–above the general value of clean waters. They are thus the citizens for whose especial benefit the Act was adopted.

Turning to the second factor, the Court notes that it has not been referred to any clear expression of a legislative intent to create a federal cause of action as suggested by plaintiffs. There is, however, evidence that Congress' intent was to the contrary.

Section 101(b) of the Act, 33 U.S.C. § 1251(b) expressly recognizes the "primary responsibilities and rights of states to prevent, reduce and eliminate pollution . . ." By providing that a state may assume NPDES authority, Congress transformed that policy into a reality. It is the strength of this policy which prevents the state's assumption of NPDES authority from being viewed as a federal delegation. *House Report* at 4479.

Perhaps the clearest expression of an intent that there not be a federal cause of action encompassing the instant action is found in the remarks of Rep. Wright. In explaining § 402 as it emerged from the Conference Committee, he stated:

> If the Administrator determines that a State has the authority to issue permits consistent with the act, he shall approve the submitted program. In that event, the States, under State law, could issue discharge permits. These would be State, not federal, actions. . . .

118 Cong.Rec. 33761 (1972). This suggests that federal involvement with a state–administered NPDES program is limited to that role expressly provided for in the Act: Review of the permit applications submitted to the EPA and oversight to insure compliance with the Act subject to decertification of the program. That was the conclusion reached in *District of Columbia v. Schramm, supra.* The United States Court of Appeals for the District of Columbia there stated:

> By requiring states to maintain or create sufficient legal and equitable rights and remedies to deal with violations of state permits in order to exercise permit–granting powers under the Act, *Congress must have intended that states apply their own law in deciding controversies involving state permits.*

*District of Columbia v. Schramm, supra,* —— (emphasis added).

Plaintiff would infer a legislative intent to create a federal cause of action from the Act's otherwise detailed and far–reaching explicit causes of action. For example, § 509 of the Act, 33 U.S.C. § 1369 grants the Circuit Courts of Appeal original jurisdiction to entertain suits challenging the EPA's promulgation or approval of effluent limitations. The Act also explicitly provides for citizen suits to enforce effluent limitations or against the Administrator for failure to perform a nondiscretionary duty. 33 U.S.C. § 1365(a).

The Court does not believe such an inference is warranted for two reasons. First, it is evident that Congress devoted considerable attention to the federal–state relationship inherent in the NPDES program. Section 402 is, in large part, the House version of the 1972 amendments and it afforded the states a greater and more active role in permit issuance than did the Senate bill.

The Court is of the opinion that the evolution of § 402 thus counsels against inferring an intent to create a cause of action simply because others were explicitly provided. Second, the provision for other causes of action equally supports the inference that Congress did not intend there be other rights. In short, it may also be argued that Congress said all it had to say on the subject. This is especially plausible where the express remedies encompass "practically every [other] decision" under the Act, Memorandum of Plaintiffs in Response to the Court's March 20, 1980 Letter to Counsel at 5, and where the relevant statutory provision was debated in such detail.

Plaintiffs further assert that a legislative intent to create a federal cause of action may be gleaned from Congress' inclusion of a "savings clause" in the Act. Section 505 of the Act, 33 U.S.C. § 1365, is the citizen suit provision and subsection (e) provides:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a state agency).

Plaintiffs contend that the savings clause indicates a legislative intent that citizens be afforded a cause of action in addition to that found in § 505(a) and which would encompass the instant suit.

Consideration of that assertion first requires a delineation of the intended scope of the savings clause. A Senate Report stated that § 505(e) would preserve a plaintiff's rights "under any *other* law". S.Rep.No. 92–414, 92nd Cong. 2d Sess., *reprinted* in [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3746 (emphasis added). It ·is also doubtful that a savings clause would have been at all necessary to preserve rights elsewhere created in the same statute. Under this reasoning, § 505(e) would be deemed to preserve causes of action created by other laws, and hence, would not justify the inference of an intent to create the suggested cause of action.

Nevertheless, the Court will assume that § 505(e) was meant to include the Act within its scope. It must be noted, however, that § 505(e) does not create any rights, it merely preserves them. It is thus apparent that plaintiffs' § 505(e) argument simply begs the question as to whether an implied federal cause of action exists in the first instance. Furthermore, if there be any intent to provide for the cause of action claimed by plaintiffs, it would seem that the intent would be found within § 402. The Court finds no legislative intent to that effect, and is thus of the view that it cannot infer an intent to create a federal cause of action upon the basis of § 505(e).

With regard to the third factor, plaintiffs contend that an implied federal cause of action is necessary to further the legislature's purpose. Plaintiffs' position is that a federal cause of action is not only useful, but is necessary to insure compliance with the Act's national standards and effluent limitations. The necessity is said to arise because § 402 does not require that there be an available state forum to review permitting decisions. Plaintiffs further argue that a federal cause of action is necessary because EPA's review and oversight power are inadequate to assure state compliance with the Act.

██ The Court, however, does not understand the Congress' purpose as being limited to the control and elimination of water pollution. The Court is of the view that Congress sought to reach that goal while at the same time preserving a significant role to the states. The Act's purpose, then, was to combat water pollution problems through a "delicate partnership" of the state and federal governments. *Save the Bay, supra,* at 1284. That purpose is better served in this instance by state administration of an approved NPDES program without the interference which would certainly result from the implication of a federal cause of action. The fact that each state is bound to apply the same minimum standards does not, in the Court's opinion, alter this conclusion.

Section 402 of the Act does not require that a state program provide a forum to challenge permitting decisions. However,

the absence of such a requirement is consistent with the Court's view that an NPDES program is basically a matter of state law. *Chesapeake Bay, Inc., supra,* at 127. It thus appears that Congress reserved unto the states the reviewability of state agency permitting decisions. That is, in itself, a persuasive reason for not implying a federal cause of action as claimed by plaintiffs.

Plaintiffs are correct in noting that Congress expected the EPA to exercise its review and oversight authority sparingly. That is not to say, however, that those powers are inadequate; necessitating the implication of a federal cause of action. Rep. Wright believed that the EPA's involvement would be limited but nonetheless stated:

> The managers believe that section 402 will result in an effective permit program. There are effective controls by the Administrator. Unlawful permits or permits which would result in unacceptable effects on the waters of another state can be disapproved.

118 Cong.Rec. 33761 (1972). It is also apparent that Congress was satisfied that state administration of the NPDES program would conform to the Act. Otherwise, the EPA would not have been afforded the right to waive a portion of its review responsibilities. State administration and EPA review and oversight were obviously, in the legislature's eyes, sufficient to achieve the Act's purpose. It is not for this Court to hold otherwise.

Additionally, an implied federal cause of action would be inconsistent with the Act's statutory scheme for another reason. A federal cause of action as suggested by the plaintiffs would result in review of the issuance of NPDES permits "at different levels of the federal court system depending on the fortuitous circumstance of whether the State in which the case arose was or was not authorized to issue permits." *Crown Simpson Pulp Company, supra* at 196, 100 S.Ct. at 1095. This would surely further delay the permitting process. Those results were rejected in a similar context and the Court deems the reasoning applicable in the instant case. *Id.*

The final inquiry is whether the cause of action claimed by the plaintiffs is one "traditionally relegated to state law, in an area basically the concern of the states." *Cort,* supra 422 U.S. at 78, 95 S.Ct. at 2088. Plaintiffs contend that this inquiry must be answered in the negative. Plaintiffs apparently concede that water quality was a traditional state concern prior to the Act's passage. They argue, however, that enforcement of a federal statute is not a traditional matter of state law.

The Court is not persuaded. First, the Act did not supplant state concern for water quality, for it expressly recognizes the "primary responsibilities and rights of the states to prevent, reduce and eliminate pollution . . . ." 33 U.S.C. § 1251(b). Second, the fact that a federal statute is involved does not detract from the state's historical role, especially where that law expressly recognizes the states' responsibilities and creates a statutory scheme to promote same. To imply a federal cause of action in this case would be to ignore the spirit of federalism which pervades the Act.

There is a second area of traditional state concern which plaintiffs did not address and which clearly raises issues of federalism. That concern is the administration and supervision of a state's executive agencies. Implying a federal cause of action under the circumstances of this case would substantially undermine the efficacy of the state administrative process. As a practical matter, the exercise of the purported federal cause of action would also present pendent state law claims. The federal district courts would then be forced to assume a general review position over the state agency. An intrusion of that magnitude cannot be easily countenanced.

The *Cort* analysis must, therefore, be resolved against the implication of a federal cause of action in favor of those challenging a state's NPDES permit decision. It is not enough that plaintiffs are members of the class for whose especial benefit the Act was adopted. The Court is of the view that Congress intended, and the Act's purpose is better served by, leaving challenges such as

that presented here to the available state forums. Water pollution control is historically a state matter and the Act specifically recognizes that tradition. An implied federal cause of action would disturb the "proper Federal–State relationships needed to carry out this act effectively." 118 Cong.Rec. 33761 (remarks of Rep. Wright).

The Court is not persuaded that *National Sea Clammers, supra* is either controlling or requires a contrary conclusion. That case involved an enforcement action and the United States Court of Appeals for the Third Circuit found an implied federal cause of action to assert those claims in addition to the remedy expressly provided by § 505(a) of the Act, 33 U.S.C. § 1365(a). The question there presented is inapposite to the case at bar for two reasons.

The first reason is best demonstrated by a brief consideration of the *Cort* analysis. The plaintiffs in *National Sea Clammers, supra* were deemed to be the especial beneficiaries of the Act, as are the instant plaintiffs. The very existence of the § 505(a) citizen suit provision evidenced a legislative intent to create the necessary remedy. The implied enforcement cause of action was also consistent with the Act's scheme since a similar express remedy was created. The only distinction between the two, *i. e.*, the sixty day waiting period, was not an obstacle which had to be confronted. *National Sea Clammers, supra* at 1226. Finally, the plaintiffs sought to enforce the Act as to pollution of the Atlantic Ocean, an obviously interstate or federal concern. *National Sea Clammers* thus presented a claim for an implied federal cause of action which simply mirrored an explicit provision of the Act and did not involve traditional state concerns. The Court does not believe that the analysis in the instant action is thus inconsistent with *National Sea Clammers, supra.*

The implied federal cause of action of *National Sea Clammers* differs from the instant case in another crucial respect. An enforcement action would not disturb the Act's delicate Federal–State partnership. Nor would it intrude upon the state's administrative process. Indeed, Congress explicitly provided for such a citizen role in § 505(a) of the Act. As previously empha-

sized, the same cannot be said of an action contesting a state's decision in granting an NPDES permit.

## THE PENDENT STATE CLAIMS

■ Plaintiffs' claims II, III and IV allege violations of Virginia law and the State Board's regulations as well as violations of the Act. The state and federal claims of the complaint share "a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As such, plaintiff would normally be expected to present them in one action. Accordingly, the Court is satisfied that it possesses the power to entertain the claims founded on state law.

*Gibbs, supra*, made clear, however, that it is within the trial court's discretion to decide whether to exercise that power. Furthermore, "the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation." *Id.* at 727, 86 S.Ct. at 1139. The Court is of the opinion that it should decline to exercise pendent jurisdiction in this action.

■ Where the federal claims are dismissed prior to trial, the state claims should be dismissed, as well. *Id.* at 726, 86 S.Ct. at 1139. Furthermore, needless decisions of state law should be avoided. *Id.* There are presented here no questions of federal policy which would counsel in favor of addressing the state claims despite dismissal of the federal law allegations. In fact, for the reasons previously stated, federal policy, as reflected in the Act's scheme, counsels against an exercise of such jurisdiction. To address the state law claims at this point would be especially violative of the spirit of federalism and legislative intent heretofore discussed.

Claims II, III and IV must therefore be dismissed in their entirety. An appropriate order shall issue.