COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Felton, Judge Humphreys and Senior Judge Clements
Argued at Richmond, Virginia


COMMONWEALTH OF VIRGINIA,
  *ex rel*. VIRGINIA STATE WATER CONTROL BOARD AND
  DAVID K. PAYLOR, DIRECTOR,
  DEPARTMENT OF ENVIRONMENTAL QUALITY

v.        Record No. 2221-09-2

BLUE RIDGE ENVIRONMENTAL
  DEFENSE LEAGUE, INC., PEOPLE'S ALLIANCE
  FOR CLEAN ENERGY, BARBARA J. CRAWFORD,
  GARY MULLER AND ARDEN "TERSH" NORTON                OPINION BY
                                               JUDGE ROBERT J. HUMPHREYS
VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A        JUNE 29, 2010
  DOMINION VIRGINIA POWER

v.        Record No. 2222-09-2

BLUE RIDGE ENVIRONMENTAL
  DEFENSE LEAGUE, INC., PEOPLE'S ALLIANCE
  FOR CLEAN ENERGY, BARBARA J. CRAWFORD,
  GARY MULLER AND ARDEN "TERSH" NORTON


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

E. Duncan Getchell, Jr., State Solicitor General (William C. Mims,
Attorney General; Robert L. Chaffe, Senior Assistant Attorney
General; David C. Grandis, Assistant Attorney General, on briefs),
for appellants Commonwealth of Virginia, *ex rel.* Virginia State
Water Control Board and David K. Paylor, Director of the
Department of Environmental Quality.

J. Tracy Walker (David E. Evans; E. Duncan Getchell, Jr.; Darin K.
Waylett; Kristy A. Niehaus Bulleit; McGuireWoods LLP; Hunton
& Williams LLP, on briefs), for appellant Virginia Electric and
Power Company, d/b/a Dominion Virginia Power.

James B. Dougherty (Robert L. Wise; Law Office of J.B.
Dougherty; Bowman and Brooke LLP, on brief), for appellees.

The Commonwealth and Virginia Electric and Power Company ("appellants") appeal from an order of the Circuit Court of the City of Richmond ("circuit court") setting aside a portion of the reissuance of a five-year water discharge permit for Dominion Virginia Power's North Anna Nuclear Power Station ("NANPS"). Specifically, appellants contend that the circuit court erred in (1) reversing the Virginia State Water Control Board ("SWCB") and holding that the SWCB had not followed federal law as required by a state regulation where the SWCB had reasonably deferred to the Environmental Protection Agency's ("EPA") interpretation of federal law and its own regulations; (2) reversing the SWCB based upon the circuit court's own independent reading of EPA regulations contrary to the EPA comment letter construing its own regulations and the EPA's consistent past practice which appellants contend were entitled to, but not given, great deference by the circuit court; and (3) finding *de novo* that the waste heat treatment facility ("WHTF") is a "cooling lake" or "cooling pond" within the meaning of the former federal regulations rather than remanding for further factual determinations by the SWCB. For the following reasons, we agree with appellants and reverse the circuit court.

## I. BACKGROUND

The record in this case is voluminous and complex, but the facts relevant to the issues before us on appeal are relatively straightforward and are essentially as follows. In 1971, Lake Anna[1] was formed by the creation of a dam across the main stem of the North Anna River in Louisa and Spotsylvania counties to provide cooling water to NANPS, a nuclear power station that produces electricity by steam turbine generators. NANPS went into operation in 1978. The

---

[1] While the parties have used different labels to refer to the two impoundments that make up what the appellees refer to collectively as Lake Anna, for clarity and consistency, we will refer to them as "Lake Anna" and the "WHTF." "Lake Anna" is what the parties and the SWCB have referred to as the "cool side" or "Lake Anna Reservoir," and "WHTF" is what the parties and SWCB have referred to as the "Waste Heat Treatment Facility," "cooling lagoons," "hot side," "or "the Wild West."

impounded water is divided into two sections. Lake Anna contains a large 9,600 acre reservoir that was filled by December 1972. The WHTF is comprised of 3,400 acres subdivided further by dams into three "lagoons." The purpose of the WHTF is to allow the heated water condensed from the steam turbines from NANPS to cool to ambient temperature by flowing from one "lagoon" to the next prior to its discharge into Lake Anna.

Since 1977, Dominion has obtained a series of five-year Virginia Pollutant Discharge Elimination System ("VPDES") permits from the SWCB to discharge water from the WHTF into Lake Anna. The SWCB has consistently taken the position in the permit that a separate permit was not required for the discharge of heated water from NANPS into the WHTF because it classified the WHTF as a "waste treatment system" falling under an exception in the federal Clean Water Act, EPA regulations, and state regulations for waste treatment systems.[2]

On June 28, 2005, Dominion applied for the reissuance of the VPDES permit with the Virginia Department of Environmental Quality's ("DEQ") SWCB staff. In 2007, several non-profit organizations and individuals ("appellees") living near Lake Anna and the WHTF challenged the SWCB's regulation of NANPS's thermal discharges in the permit, and specifically challenged the reissuance of the permit on the grounds that the discharges from NANPS into the WHTF required a separate permit.[3]

---

[2] A discharge permit is required under both federal and state regulations for the discharge of pollutants into "waters of the United States" and "state waters." 33 U.S.C. § 1342(a); Code § 62.1-44.5(A)(1). However, EPA regulations and state regulations include a waste treatment system exception for discharges into water classified as a "waste treatment system," thus, not requiring a separate discharge permit for discharges of pollutants into such waters. 40 C.F.R. § 122.2; 9 VAC 25-31-10. In this and all previous permit renewal proceedings, the WHTF has been considered a "waste treatment system" by the SWCB and EPA.

[3] Under EPA regulations, hot water is considered a pollutant for the purposes of the Clean Water Act. 33 U.S.C. § 1362(6) ("The term 'pollutant' means . . . heat, . . . and industrial, municipal, and agricultural waste discharged into water."). Under Virginia regulations, hot water is considered a pollutant for the purposes of the State Water Control Law. Code § 62.1-44.3 ("'Industrial wastes' means liquid or other wastes resulting from any process of industry,

The DEQ requested an official advisory opinion from the Attorney General of Virginia on this issue in compliance with Code § 2.2-505.[4] The Attorney General's opinion, which he released on November 30, 2006, stated that the SWCB did not have "legal authorization to impose limitations on thermal effluent involved in discharges by [NANPS]" into the WHTF because the waste treatment system exception in 9 VAC 25-31-10 excludes the WHTF from the discharge permit regulations. In addition, he noted that the SWCB had historically declined to regulate the WHTF; and further, if there was any requirement for interpretation of the regulation, the agency's interpretation was entitled to "great deference" unless it was arbitrary and capricious. The Attorney General also noted that the federal waste treatment system exception specifically excluded "cooling ponds" unlike the state waste treatment system exception, but that the EPA had approved the SWCB regulations, which did not contain this exclusion.[5]

On September 20, 2007, the EPA's Region III Director of the Water Protection Division submitted a comment to the proposed VPDES permit by letter ("EPA Letter") to the DEQ. In the EPA Letter, the director specifically stated "[f]ollowing this review, and in the exercise of EPA's discretion in NPDES permit oversight matters, EPA does not object to []DEQ's issuance of the North Anna VPDES permit." The director also noted the DEQ's determination that the

manufacture, trade, or business or from the development of any natural resources."); see also Code § 62.1-44.5(A)(1) ("[I]t shall be unlawful for any person to . . . [d]ischarge into state waters . . . industrial wastes . . . .").

[4] "The Attorney General shall give his advice and render official advisory opinions in writing only when requested in writing so to do by . . . the head of a state department, division, bureau, institution or board." Code § 2.2-505.

[5] While the EPA relinquished authority to issue NPDES permits to the Commonwealth as permitted by the Clean Water Act and federal regulations, 33 U.S.C. § 1342(b) & (c)(1) (2000), 40 C.F.R. § 122.1(a)(2), it still retains supervisory power to respond, object, or make comments or recommendations to proposed permits as set forth in the Memorandum of Understanding ("MOU") between the SWCB and the Regional Administrator of the EPA. Memorandum of Understanding Regarding Permit and Enforcement Programs Between the State Water Control Board and the Regional Administrator, Region III, Environmental Protection Agency 3 (Mar. 31, 1975) [hereinafter "Memorandum of Understanding"].

WHTF is a "waste heat treatment facility" subject to the waste treatment system exception, the Attorney General's confirmation of the DEQ's determination that the WHTF was subject to the exception, and the history of the federal regulation and exception. The EPA director then concluded that the "EPA is not objecting to []DEQ's determination on the *regulatory status* of the [WHTF]." (Emphasis added).

On October 25, 2007, the SWCB reissued the NANPS permit without regulating the discharge of heated water from NANPS into the WHTF. Appellees then pursued an appeal of right under the Virginia Administrative Process Act to the circuit court. On February 20, 2009, the circuit court determined that Virginia law required regulation of the discharges from the power plant into the WHTF because the waste treatment system exception contained in the EPA regulations did not apply to the WHTF. The circuit court specifically held that the exception is inapplicable because the WHTF is a "cooling lake," which is included in the definition of "waters of the United States."[6]

On February 27, 2009, appellants filed a joint motion for reconsideration of the February 20, 2009 ruling in light of Ohio Valley Environmental Coalition v. Aracoma Coal Co., 556 F.3d 177 (4th Cir. 2009), petition for cert. filed, 78 U.S.L.W. 3099 (U.S. Aug. 26, 2009) (No. 09-247),

---

[6] The circuit court based this determination on the 1979 EPA definition of "cooling lake" in the context of technology-based rules for steam electric generating facilities in 40 C.F.R. § 423.11(n). The circuit court turned to this definition because the federal "waste treatment facilities" exception included an "exception to the exception" for "cooling ponds" and referenced 40 C.F.R. § 423.11(m) for definition purposes. The circuit court then held that "[t]he waste treatment system exception simply does not include cooling ponds or lakes." However, in any event, this "exception to the exception" part of the regulation in 40 CFR § 122.2 was suspended in 1982 and the definitions of "cooling pond" and "cooling lake" in 40 C.F.R. § 423.11 were removed by the EPA and were not part of the federal regulatory scheme at the time the circuit court rendered its decision in this case. 47 Fed. Reg. 52,290 (Nov. 19, 1982). Prior to its removal from the regulations, "cooling lake" was defined as "any manmade water impoundment which impedes the flow of a navigable stream and which is used to remove waste heat from heated condenser water prior to recirculating the water to the main condenser." 39 Fed. Reg. 36,186, 36,199 (Oct. 8, 1974).

a decision by the United States Court of Appeals for the Fourth Circuit which upheld the application of the federal waste treatment system exception to systems created in waters of the United States for salt mining purposes. However, the circuit court disagreed, and in its June 8, 2009 order held that the factual differences between this case and Ohio Valley warranted a different conclusion. Specifically, the circuit court reasoned that the SWCB's application of the waste treatment system exception in this case was inconsistent with federal regulations, and not entitled to deference because a state agency's discretion "cannot be exercised in a manner 'inconsistent with the regulation.'"

On September 14, 2009, the circuit court entered the final order holding that Virginia law required state regulation of the WHTF consistent with the circuit court's interpretation of federal EPA regulations. Specifically, the circuit court held that the SWCB was required to regulate the discharge of heated water from NANPS into the WHTF due to the fact that the WHTF is a "water[] of the United States" as defined by federal regulation; and because the circuit court classified the WHTF as a "cooling lake," it held that the WHTF does not fall under the "waste treatment systems" exemption.[7] Thus, the circuit court held the SWCB erred as a matter of law in declining regulatory jurisdiction over the WHTF. In declining to regulate the WHTF, the circuit court held that the SWCB, when it reissued the NANPS permit, violated Virginia State Water Control Law VPDES regulations, and relevant portions of the Clean Water Act. More specifically, the circuit court held that "to the extent the state is protecting less than what is

---

[7] At oral argument, appellees' counsel conceded that the circuit court misapplied 40 CFR § 122.2 (the federal waste treatment systems exemption) to the present case, but argued for the first time that it, nonetheless, reached the right result for the wrong reason. Appellees did not brief this issue, thus we decline to consider it. See Rule 5A:21(b).

protected by the C[lean] W[ater] A[ct], the state is violating state law." The circuit court then remanded the permit back to the SWCB for further proceedings consistent with its holding.

This appeal followed.

## II. ANALYSIS

Appellants argue that the circuit court erred in (1) finding the SWCB erred by failing to conduct an independent assessment of compliance with federal law and in deferring to the EPA Letter; (2) failing to defer to the EPA's interpretation of federal law by reaching the merits of the meaning of federal law and misapprehending that law; (3) failing to accord the appropriate deference to the EPA's interpretation of federal regulations by concluding that the federal exception does not apply; and (4) remanding and directing the SWCB to issue the permit pursuant to its *de novo* determinations. Essentially, appellants contend that the circuit court erred in the standard of review it applied with respect to the SWCB's interpretation of its own regulations, and the standard of review it applied to SWCB's deference to the EPA Letter.

## A. Standard of Review

Code § 2.2-4027 of the Virginia Administrative Process Act ("VAPA") authorizes judicial review of an agency decision. Under VAPA, the circuit court reviews an agency's action in a manner "'equivalent to an appellate court's role in an appeal from a trial court.'" J.P. v. Carter, 24 Va. App. 707, 721, 485 S.E.2d 162, 169 (1997) (quoting Sch. Bd. v. Nicely, 12 Va. App. 1051, 1061-62, 408 S.E.2d 545, 551 (1991)). "In this sense, the General Assembly has provided that a circuit court acts as an appellate tribunal." Gordon v. Allen, 24 Va. App. 272, 277, 482 S.E.2d 66, 68 (1997) (citation omitted). "The burden is upon the party complaining of the agency action to demonstrate an error of law subject to review." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 241, 369 S.E.2d 1, 6 (1988) (citing Code § 9-6.14:17; Roanoke Memorial Hospitals v. Kenley, 3 Va. App. 599, 603, 352 S.E.2d 525, 527 (1987)).

Judicial review of an agency decision is limited to determining "1. [w]hether the agency acted in accordance with law; 2. [w]hether the agency made a procedural error which was not harmless error; and 3. [w]hether the agency had sufficient evidential support for its findings of fact." Id. On reviewing the claims of error, an agency's factual determination is given substantial judicial deference, and is reviewed "only for whether they have support in substantial evidence." Mazloumi v. Dep't of Envtl. Quality, 55 Va. App. 204, 208, 684 S.E.2d 852, 854 (2009).

On appeal of an agency's determination of law, the deference accorded depends on the law being interpreted.

> [W]here the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, *the agenc's decision is entitled to special weight in the courts*. "The rationale of the statutory scheme is that the [administrative agency] shall apply expert discretion to matters coming within its cognizance, and judicial interference is permissible only for relief against the *arbitrary or capricious action that constitutes a clear abuse of the delegated discretion*. The reviewing judicial authority may not exercise anew the jurisdiction of the administrative agency and merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function." Va. Alcoholic Beverage Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979).

Johnston-Willis, Ltd., 6 Va. App. at 243-44, 369 S.E.2d at 8 (emphasis added). "'A decision is arbitrary and capricious only if there is no credible evidence in the record to support the finding and the agency arbitrarily disregarded uncontradicted evidence.'" Mazloumi, 55 Va. App. at 209, 684 S.E.2d at 855 (quoting Palmer v. Commonwealth Marine Res. Comm'n, 48 Va. App. 78, 87, 628 S.E.2d 84, 89 (2006)). Under this deference, "[c]ourts generally defer to an agency's interpretation of its own regulations." Id.

However, courts do not defer to an agency's interpretation "'[i]f the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or constitutional law . . . .'" Johnston-Willis, Ltd., 6 Va. App. at 243, 369 S.E.2d at 8 (quoting Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir. 1981) (citing Piper v. Chris Craft Industries, 430 U.S. 41 n.27 (1977))). An agency's "legal interpretations of statutes" is accorded no deference because "[w]e have long held that 'pure statutory interpretation is the prerogative of the judiciary,' and thus, Virginia courts 'do not delegate that task to executive agencies.'" The Mattaponi Indian Tribe v. Commonwealth Dep't of Envt'l Quality, 43 Va. App. 690, 707, 601 S.E.2d 667, 676 (2004) (quoting Finnerty v. Thornton Hall, Inc., 42 Va. App. 628, 634-35, 593 S.E.2d 568, 571 (2004)), aff'd in part, rev'd in part sub nom. Alliance to Save the Mattaponi v. Commonwealth Dep't of Envt'l Quality ex rel. State Water Control Board, 270 Va. 423, 621 S.E.2d 78 (2005).

> [W]here the issue involves a legal determination or statutory interpretation, this Court does a *de novo* review, especially if the statutory language is clear. "We are required to construe the law as it is written. 'An erroneous construction by those charged with its administration cannot be permitted to override the clear mandates of a statute.' Hurt v. Caldwell, 222 Va. 91, 97, 279 S.E.2d 138, 142 (1981). When an agency's statutory interpretation conflicts with the language of the statute or when the interpretation has not been consistently and regularly applied, the usual deference to an agency's interpretation should be withheld. University of Richmond v. Bell, 543 F. Supp. 321, 327 (E.D. Va. 1982)." Commonwealth, Dep't of Mines, Minerals & Energy v. May Bros., Inc., 11 Va. App. 115, 119, 396 S.E.2d 695, 697 (1990).

Shippers' Choice of Va., Inc. v. Smith, 52 Va. App. 34, 37-38, 660 S.E.2d 695, 696-97 (2008), rev'd on other grounds, 277 Va. 593, 674 S.E.2d 695 (2009).

### B. The Circuit Court's Deference to the SWCB

Appellants contend that the circuit court erred in finding the SWCB erred in relying on the EPA Letter and had a duty under state law to independently construe the EPA's regulations,

thus creating an obligation for the SWCB that is not in federal or state law. Specifically, appellants contend that the SWCB had no duty to make an independent assessment of the federal Clean Water Act and its attendant regulations, since neither state nor federal law give the SWCB the right, power, or obligation to make such an independent assessment. Appellants further contend that the SWCB's deference to the EPA Letter construing the EPA's own regulations is not arbitrary, capricious, or contrary to law. Finally, appellants maintain that even assuming the circuit court properly reached the merits of the meaning of federal law, it misapprehended federal law without giving proper deference to the EPA's interpretation when it determined that "cooling lakes" and "cooling ponds" are excluded from the federal waste treatment system exception. Furthermore, appellants allege the circuit court did not give proper deference to the EPA's interpretation of the federal regulation when it held that the exception does not apply to "cooling lakes" or "cooling ponds."[8]

First, we note that the requirement that a VPDES permit be "issued by the [SWCB] pursuant to the Clean Water Act and the State Water Control Law" is a regulatory requirement and not a statutory one. 9 VAC 25-31-20. Thus, reviewing courts must give special weight to the agency's interpretation of its own regulation, and interfere only if its interpretation is

---

[8] Appellants cite Ohio Valley to support their contention that an agency's interpretation of its own regulation is compelling when the agency has consistently maintained that interpretation. 556 F.3d at 213-15 (Fourth Circuit holdings are not controlling on this Court, but can be turned to as persuasive authority. See Steffel v. Thompson, 415 U.S. 452, 485 n.3 (1974) (Rehnquist, J. concurring)). In Ohio Valley, the Fourth Circuit upheld the EPA's decision that "waters of the United States," as used in the Clean Water Act, does not require instream waste treatment systems to be classified by permit writers as "waters of the United States" in every instance. 556 F.3d at 213-15.

While the Fourth Circuit decision is not binding on us but can be persuasive, we do not find it so with respect to the facts of this case. In Ohio Valley, the federal court reviewed permits issued by the U.S. Army Corps of Engineers involving strip mining and analyzed them under the federal Clean Water Act. In this case we are reviewing a permit issued by the SWCB and analyzing it in light of state regulations and the MOU. Thus, we do not find Ohio Valley applicable based on the facts in this case.

arbitrary or capricious constituting a clear abuse of its delegated discretion.  Johnston-Willis, Ltd., 6 Va. App. at 243-44, 369 S.E.2d at 8.

In turning to the permit program and the requirements of the SWCB, we note this case is one of first impression in Virginia, and, thus, we must look closely at the interplay between the SWCB and the EPA, and the "delicate partnership" between the two in eliminating water pollution.  Chesapeake Bay Found., Inc. v. Va. State Water Control Board, 495 F. Supp. 1229, 1232 (E.D. Va. 1980) ("The [Clean Water Act], in general, and the NPDES program, in particular, thus join the state and federal governments in a 'delicate partnership' endeavoring to control and eventually eliminate water pollution." (quoting Save the Bay, Inc. v. Administrator of EPA, 556 F.2d 1282, 1284 (5th Cir.), reh'g den., 560 F.2d 1023 (1977))).  Since the enactment of the federal Clean Water Act, 33 U.S.C. § 1251 et seq., in 1972, a National Pollutant Discharge Elimination System ("NPDES") permit is required under federal law for discharges into navigable "waters of the United States."  33 U.S.C. § 1342(a).[9]  Similarly, Virginia State Water Control Law, Code §§ 62.1-44.2 to -44.34:28, requires a VPDES permit for the discharge of pollutants into "state waters."  Code § 62.1-44.5(A)(1).  However, both federal and state law include a "waste treatment system" exception which, if applicable, eliminates the need for an

---

[9] Specifically,

> the Clean Water Act prohibits the discharge of pollutants except pursuant to an NPDES permit issued by the EPA.  The "discharge of pollutants" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  "Navigable waters" are defined as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

West Virginia Coal Assoc. v. Reilly, 728 F. Supp. 1276, 1288 (S.D. W. Va. 1989).

additional permit for discharge of pollutants into either "waters of the United States" or "state waters." 40 C.F.R. § 122.2[10]; 9 VAC 25-31-10.[11]

The Clean Water Act and federal regulations allow states to administer their own NPDES program in place of the federal program once the state program is approved by the EPA, authorized under state law, and has standards that are at least as stringent as federal standards. 33 U.S.C. § 1342(b) & (c)(1) (2000); 40 C.F.R. § 122.1(a)(2). In 1975, the EPA approved Virginia's program. Consequently, the federal NPDES was suspended, and the SWCB now administers Virginia's pollutant discharge elimination system program. Virginia: State Program for Control of Discharges of Pollutants to Navigable Waters, 40 Fed. Reg. 20,129 (May 1, 1975). "Under this statutory scheme, a permit issued by Virginia serves as both a VPDES and a NPDES

---

[10] 40 C.F.R. § 122.2:

> Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of [the] C[lean] W[ater] A[ct] (other than cooling ponds as defined in 40 CFR § 423.11(m) which also meet the criteria of this definition) are not waters of the United States. This [exception] applies only to manmade bodies of water which neither were originally created in waters of the United States (such as disposal area in wetlands) nor resulted from the impoundment of waters of the United States. [See Note 1 of this section.]
>
> [Note 1. -- At 45 FR 48620, July 21, 1980, the [EPA] suspended until further notice in § 122.2, the last sentence beginning "This [exception] applies . . ." in the definition of "Waters of the United States." This revision continues that suspension.].

[11] 9 VAC 25-31-10:

> Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the [Clean Water Act] and the law, are not surface waters. Surface waters do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other agency, for the purposes of the Clean Water Act, the final authority regarding the Clean Water Act jurisdiction remains with the EPA.

permit." State Water Control Board v. Smithfield Foods, Inc., 261 Va. 209, 212, 542 S.E.2d 766, 768 (2001).

The Virginia State Water Control Law permits the SWCB to "adopt rules governing the procedure of the [SWCB] with respect to: . . . (c) the issuance of certificates . . . ." Code § 62.1-44.15(7). Pursuant to this power, the SWCB adopted the VPDES Permit Regulations, which "delineate[] the procedures and requirements to be followed in connection with VPDES permits issued by the [SWCB] pursuant to the Clean Water Act and the State Water Control Law." 9 VAC 25-31-20. Under these regulations, a permit cannot be issued if "the conditions of the permit do not provide for compliance with the applicable requirements of the C[lean] W[ater] A[ct] or the law, or regulations promulgated under the C[lean] W[ater] A[ct] or the law." 9 VAC 25-31-50(C).

Although Virginia issues the permits, as noted above, the EPA retains supervisory power to respond, object, or make comments or recommendations to proposed permits as set forth in the MOU.[12] 33 U.S.C. § 1342(c)(3), (d); Memorandum of Understanding 3. In compliance with the EPA's supervisory power, the SWCB submits *all* proposed permits to which the EPA has not waived its right of review to the Regional Administrator of EPA's Region III, and the EPA has thirty days under the MOU, Memorandum of Understanding 5-6, and ninety days under the Clean Water Act, 33 U.S.C. § 1342(d), from receipt of the proposed permit to take any of the above mentioned actions. If the EPA objects, the state permit cannot be issued unless it makes revisions satisfactory to the EPA. 33 U.S.C. § 1342(d)(2)-(4).

---

[12] The MOU's purpose is "to develop an understanding concerning the implementation of [SWCB's and the Regional Administrator, Region III, U.S. EPA's] respective responsibilities in the area of water quality control within the Commonwealth of Virginia." Memorandum of Understanding 1.

In 1980, the United States District Court for the Eastern District of Virginia analyzed the role that the EPA has within Virginia's state administered NPDES program. Chesapeake Bay Found., Inc., 495 F. Supp. 1229.[13] The district court noted the following:

> Once a state has assumed NPDES authority, the EPA's role is largely supervisory. The EPA has a review function in that the state must submit NPDES permit applications to the Administrator for his consideration. The Administrator may, within ninety days prevent the issuance of a permit by exercising his veto, 33 U.S.C. § 1342(d); or, the Administrator may acquiesce in a permit's issuance; which decision is totally discretionary and unreviewable. Mianus River Preservation Committee v. EPA, 541 F.2d 899, 907 (2d Cir. 1976); Chesapeake Bay Foundation, Inc. v. United States, 445 F. Supp. 1349, 1353 (E.D. Va. 1978). EPA may, however, waive the notification requirement and its right to object to particular categories of permits. 33 U.S.C. § 1342 (e) and (f). *The EPA's oversight function refers to its continued supervision of a state program to insure compliance with the [Clean Water] Act's requirements.* If a state program proves to be inadequate or poorly administered, etc., the EPA may withdraw its earlier certification. 33 U.S.C. § 1342 (c)(3).
>
> The [Clean Water] Act, in general, and the NPDES program, in particular, thus join the state and federal governments in a "delicate partnership" endeavoring to control and eventually eliminate water pollution. Save the Bay, supra at 1284. The permitting process under § 402(b) is, for the most part, undeniably a state program. District of Columbia v. Schramm, No. 78-2209 (D.C. Cir. 1980). The state character of an approved NPDES program is so strong, moreover, that the state's assumption of that responsibility is not viewed as a delegation of federal authority. H.R.Rep.No.95-830,

---

[13] In Chesapeake Bay Found., Inc., the district court analyzed whether there was an implied federal cause of action under the Clean Water Act, and in doing so determined the scope of the EPA's involvement in a state executed NPDES program. In determining that an implied federal cause of action would be inconsistent with Congress's intent, the Clean Water Act's statutory scheme, and ignorant of the spirit of federalism within the Clean Water Act, the district court held that the Clean Water Act recognized that water pollution control has historically been a state matter and found that "[a]n implied federal cause of action would disturb the 'proper Federal-State relationships needed to carry out this [Clean Water A]ct effectively.'" Chesapeake Bay Found., Inc., 495 F. Supp. at 1238 (quoting 118 Cong. Rec. 33761 (remarks of Rep. Wright)).

95th Cong., 1st Sess. 3 (1977), reprinted in U.S.Code Cong. & Admin.News, pp. 4424, 4479 (1977) ("House Report").

Id. at 1232 (emphasis added).

The district court further noted that "[t]he [Clean Water] Act necessarily requires that the state program be administered in accordance with the federal requirements. *Indeed, that is the subject of the EPA's oversight function.*" Id. at 1234 (citing 33 U.S.C. § 1342(d)(2)) (emphasis added).

> [F]ederal involvement with a state-administered NPDES program is limited to that role expressly provided for in the [Clean Water] Act: Review of the permit applications submitted to the EPA and oversight to insure compliance with the [Clean Water] Act subject to decertification of the program. . . . "By requiring states to maintain or create sufficient legal and equitable rights and remedies to deal with violations of state permits in order to exercise permit-granting powers under the [Clean Water] Act, Congress must have intended that states apply their own law in deciding controversies involving state permits."

Id. at 1235 (quoting Schramm, No. 78-2209).

Turning to the facts of this case, the record clearly shows that the SWCB did not reach its decision to reissue the permit, and decline to regulate the discharge of heated water from NANPS into the WHTF without regard to the permit's compliance with the Commonwealth's statutory scheme, SWCB regulations, the Clean Water Act, and federal EPA regulations. In making its final determination, the SWCB had before it voluminous information from the DEQ staff as well as the materials and comments presented at the public hearing. The SWCB also had the legal opinion it requested from the Attorney General in which he concluded that the SWCB was without jurisdiction to separately regulate the WHTF; and it had the EPA Letter noting the issue of the WHTF's regulatory status, the previous history of its treatment under federal regulations and the EPA, and the EPA's ultimately not objecting to the reissuance of the permit. In addition, the SWCB had the benefit of the past twenty years' history of the SWCB holding the WHTF as

falling under the waste heat treatment system exception under EPA regulations and state regulations, and the recommendation of the DEQ to reissue the permit without regulating the WHTF.

Further, to the extent that the SWCB relied on the EPA Letter in determining compliance with the Clean Water Act and federal regulations implementing it, its reliance was not arbitrary or capricious in light of the "delicate partnership" and the EPA's interpretation of its own regulations. As noted above, the EPA plays a supervisory role in the VPDES/NPDES permit process that is limited to "[r]eview of the permit applications submitted to the EPA and oversight to insure compliance with the [Clean Water] Act subject to decertification of the program." Id. In the EPA Letter, the EPA went through the regulatory history of the federal waste treatment system exemption and noted

> To date, there has been no additional federal rulemaking to clarify whether, or under what circumstances, the "waste treatment system" [exception] may include cooling ponds, lakes, or lagoons that are created in waters of the United States, or that result from the impoundment of waters of the United States. Thus, NPDES permitting authorities, both EPA and approved states, have some discretion in determining whether particular cooling water impoundments qualify for the "waste treatment system" [exception] from the definition of "waters of the United States." EPA recognizes that this regulatory background may present difficult, case-specific issues in applying the "waste treatment system" [exception] to cooling water impoundments. However, given the above-recited permitting and regulatory history, and circumstances of the creation and continuing use of the cooling lagoons to treat the thermal discharge from [NANPS], EPA is not objecting to VaDEQ's determination on the regulatory status of the cooling lagoons/WHTF.

In light of the EPA's oversight requirement to ensure state compliance with the Clean Water Act, and the interplay between the EPA and the SWCB as set forth in the MOU, the SWCB did not err to the extent it deferred to the federal agency's determination of the permit's compliance with

- 16 -

federal law to support its conclusion that the permit was issued "pursuant to the Clean Water Act."[14]

Therefore, we hold that the SWCB's decision not to regulate the WHTF based on its determination that it fell under the "waste heat treatment system" exemption was not arbitrary or capricious constituting an abuse of its delegated discretion, and, thus, the circuit court erred in not according deference to the SWCB in its construction of its own regulations and erred further in not permitting the SWCB to defer to the EPA's construction of federal regulations. Accordingly, we reverse the circuit court on that basis. Because we hold that the SWCB's interpretation of its regulations was not arbitrary or capricious, we need not reach the merits of appellants' alternative argument that if the SWCB erred, the circuit court should have remanded the case back to the SWCB for it to independently apply the federal regulations to the record before it.

### III.  CONCLUSION

For the foregoing reasons, we reverse the decision of the circuit court and remand for further proceedings consistent with this opinion.

<u>Reversed and remanded.</u>

---

[14] Appellees contend that the EPA Letter is not a legal determination that is owed deference by the SWCB, the circuit court or this Court based on (1) <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001), in which the Supreme Court of the United States set forth the degree of deference a court is to give an agency's interpretation of law; and (2) the fact that the EPA Letter is inconsistent with the EPA's long standing position that "cooling lakes" fall under the federal/state regulations.  However, neither the circuit court nor this Court is reviewing the EPA's determination in this case and indeed have no authority to do so.  However, based upon the MOU, the SWCB was entitled to rely upon the EPA Letter and defer to its conclusions.