UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Petty, McCullough and Chafin
Argued at Richmond, Virginia


THE CHESAPEAKE BAY FOUNDATION, INC.
  AND CITIZENS FOR STUMPY LAKE, INC.

MEMORANDUM OPINION[*] BY
v.      Record No. 1897-12-2      JUDGE STEPHEN R. McCULLOUGH
APRIL 22, 2014

COMMONWEALTH OF VIRGINIA, *ex rel.*
  VIRGINIA STATE WATER CONTROL BOARD,
  DAVID K. PAYLOR, DIRECTOR, VIRGINIA
  DEPARTMENT OF ENVIRONMENTAL QUALITY
  AND TRI-CITY PROPERTIES, LLC


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

Robert L. Wise (Bowman and Brooke LLP, on briefs), for
appellants.

David C. Grandis, Assistant Attorney General; Paul R. Schmidt
(Kenneth T. Cuccinelli, II, Attorney General; Elizabeth A. Andrews,
Senior Assistant Attorney General; Poole Mahoney, P.C., on brief),
for appellees.


The present appeal is the latest chapter in litigation that has spanned more than a decade.

Raising a number of issues, the Chesapeake Bay Foundation and Citizens for Stumpy Lake appeal

from a permit issued by the State Water Control Board. The permit authorizes Tri-City to drain

wetlands as it develops a mixed-use, master-planned community in the City of Chesapeake.[1]

Judge McCullough would affirm the Board on the merits. Judge Chafin concludes that we

lack jurisdiction over this appeal because the Foundation's appeal is untimely. She would dismiss

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] For the sake of simplicity, I will refer to the Chesapeake Bay Foundation as the
Foundation and to the State Water Control Board as the Board.

the appeal, which would result in affirmance. Consequently, although the Court does not issue a controlling opinion, the judgment of the circuit court is affirmed.

BACKGROUND

I. ECONOMIC GROWTH IN CHESAPEAKE

Forecasts call for the Greenbrier area of the City of Chesapeake to add nearly eight thousand new jobs by the year 2026. Beginning in the mid-1980s, as various related companies anticipated this growth and the need for housing in the area, they began to acquire parcels of land with a view to develop a master-planned, mixed-use community. It is undisputed that a principal of these companies is also a principal of Tri-City, one of the appellees in this case. These parcels, purchased at a total cost in excess of $15 million, ultimately were consolidated into a 428.2-acre parcel.

This 428.2-acre parcel is located north of Elbow Road and east of Centerville Turnpike in Chesapeake. Of the 428.2-acre site, a majority of the acreage consists of palustrine,[2] forested wetlands, with the remainder consisting of uplands. The property drains in two separate directions, with approximately 61% of the property draining north into Stumpy Lake. The remaining area drains into Gum Swamp.

Stumpy Lake, originally constructed as a reservoir for the City of Norfolk, was purchased by the City of Virginia Beach in 2001 for $13 million. It now serves as a nature preserve and recreational area. The area also provides habitat for threatened or endangered species, including the bald eagle, canebrake rattlesnake, and the Dismal Swamp southeastern shrew.

The area around Stumpy Lake is now heavily developed. That development has decreased the habitat available for a number of species, affected the water quality in Stumpy

---

[2] "Palustrine" means "being or made up of marsh." Webster's Third New International Dictionary 1628 (1981).

Lake, and reduced wetlands. Wetlands function as natural filters, floodwater storage zones, groundwater recharge areas, sediment traps, and provide habitat for wildlife.

The City of Chesapeake approved the zoning for the project and approved the development master plan in 1989. As part of this process, Tri-City proffered 20 acres of the parcel to be set aside as a park. Original development plans called for 433 single-family residential units. The City of Chesapeake's 1995 conditional rezoning of this area limited the number of single-family units to 284. As a part of the 1995 rezoning, Tri-City made a number of proffers, including road improvements, dedication of a school site, a 20-acre park, and a fire station site.

## II. TRI-CITY APPLIES FOR A PERMIT TO DRAIN OR FILL WETLANDS TO BUILD A MASTER-PLANNED, MIXED-USE COMMUNITY

Tri-City initially applied for a permit with the Board on September 14, 2000. The proposal was for a master-planned, mixed-use community that would include both commercial and residential development, consisting of single-family homes, townhomes, condominiums, and apartments. Initially, Tri-City's development plan would have impacted all of the site's 253.5 acres of wetlands.

At the time Tri-City applied for this permit, the United States Army Corps of Engineers (the Corps) had not delineated the wetlands on the site. Therefore, Tri-City hired a private firm, Environmental Specialties Group (ESG), to perform this task. Following ESG's initial delineation of wetlands, Bert W. Parolari, Jr., the Water Resource Programs Manager for the Department of Environmental Quality, wrote a detailed letter to Tri-City on April 5, 2001 questioning whether an approximately 52-acre area, designated as uplands in the ESG wetlands delineation, contained more wetlands than noted on ESG's delineation. Parolari requested a

re-delineation. ESG reconsidered and later revised its delineation, adding additional wetlands.[3] The record reflects the detailed measurements ESG performed in making its delineation. On March 27, 2002, the firm certified that the site contained 253.5 acres of palustrine, forested wetlands and 174.7 acres of uplands. The Virginia Department of Environmental Quality, the DEQ, asked the Corps to verify the delineation performed by ESG. The Corps responded by letter dated March 27, 2002, but did not make its own delineation at the time or object to the delineation made by ESG.

On October 7, 2002 and March 25, 2003, the Board held public hearings in response to the permit application. Following the March 25, 2003 hearing, the Board voted to defer action on the permit to allow staff time to review materials submitted and answer questions that were raised. The Board entertained additional limited comments at a meeting held on October 28, 2003. The Board received extensive written and verbal comments in opposition to and in support of the project.

The Foundation leveled a number of criticisms at the project. The Foundation also submitted alternative plans for the development of the parcel, which Tri-City rejected as unfeasible. In addition to these criticisms, a number of citizens expressed their concern at the threat the project might pose to Stumpy Lake. William Pratt, the President of Citizens for Stumpy Lake, exemplifies this concern. In his view, the project poses a threat to the water quality in the area and will reduce habitat for fish and wildlife.

The City of Virginia Beach also had reservations about the project and the impact it might have on the wildlife and water quality of Stumpy Lake. In contrast, the City of

---

[3] The wetlands delineation does not include wetlands lost to ditching activity that occurred prior to the application.

Chesapeake supported the project as being "beneficial to the long-term economic development of the City."

State and federal agencies provided comments. The Fish and Wildlife Service of the United States Department of the Interior expressed a number of concerns about the project, as did the United States Environmental Protection Agency (EPA) and the Corps. The Virginia Department of Game and Inland Fisheries concluded that the project, as ultimately approved by the Board, would not imperil endangered or threatened species and, for some of those species, would result in a gain in habitat.

Throughout the permitting process, the DEQ and Tri-City engaged in negotiations to reduce the impact of the project. As a result, Tri-City agreed to make a number of significant changes to the project to lessen the damage to wetlands. Rather than impacting all of the wetlands, the revised project avoided 108 of the 253 acres of wetlands, for a loss of 145 acres. Tri-City accomplished some of the avoidance by moving a school to an off-site location, relocating the park site to a conservation area, relocating some of the single-family residences, and moving a road. It also added a conservation buffer area between the project and Stumpy Lake.

In addition, Tri-City agreed to install state-of-the-art stormwater filtration features such as wetlands benches, bioretention areas, curb wipes, and grassy swales. These features will reduce erosion and improve water quality.

Tri-City also agreed to create 290 acres of wetlands offsite, which amounts to two acres of new wetlands for every acre destroyed in the project. Once the DEQ staff learned that Tri-City owned the adjoining parcel, it engaged in negotiations to secure 145 acres of wetlands on the adjoining property, in addition to the other changes to the permit. After Tri-City agreed to this concession, the DEQ reached the conclusion that these 145 immediately contiguous acres,

when combined with other concessions including the 290 acres of restored wetlands offsite, met the requirement of ensuring that there is no net loss of acreage and functions. At the Board's final meeting, the DEQ staff acknowledged that the application resulted in a greater destruction of wetlands than typically occurs, but that the permit also contemplated more protective measures than typically seen in a proposal.

On November 21, 2003, the Board issued a permit to Tri-City. The Board found that Tri-City had avoided 108.9 acres of wetlands, or 42% of the total wetlands, by (1) relocating development to upland areas where practicable; (2) including a conservation area containing 86.3 acres of wetlands; (3) relocating a public park, designating the majority of the wetlands in the park as "passive recreational" areas; and (4) relocating the proposed school to an off-site location. Finally, Tri-City minimized impacts to area wetlands by incorporating enhanced stormwater management into the project.

The permit authorizes Tri-City to convert 144.6 acres of wetlands to uplands through fill or the excavation of ditches. The Board's decision was unanimous. The permit is for a fifteen-year term and expires in 2018. The two-part permit, which spans eighteen pages, imposes a number of detailed conditions on Tri-City. Among other things, Tri-City must compensate for the destruction of the wetlands by restoring 290 acres of palustrine, forested wetlands, as well as conserving 145 acres of forested wetlands on the property directly adjacent to Stumpy Lake.

III. THE CORPS DECLINES TO ISSUE A PERMIT AND MAKES A NEW WETLANDS DELINEATION.

In addition to a state permit, the project requires a federal permit. On January 21, 2005, Tri-City applied to the Corps for a permit to impact 144.6 acres of forested wetlands. On March 14, 2005, almost three years after it was asked to review ESG's delineation, the Corps concluded that the DEQ approved wetlands delineation was not accurate. The Corps approved a new

wetlands designation on January 17, 2007.  The Corps' designation added 36.7 acres of wetlands to the DEQ-approved wetlands delineation.  In contrast to the detailed data gleaned by ESG, on this record, the basis of the Corps' additional delineation is rather vague.  The record shows only that the Corps noted "ponding water and blackened leaves in designated upland areas" during a site visit with EPA.  On March 3, 2008, following a number of amended proposals and counter-proposals, the Corps determined that the project was contrary to the public interest and denied Tri-City a permit.

The Foundation appealed the November 2003 decision of the Board to the Circuit Court of the City of Richmond.  That court entered an order on January 17, 2012, stating that it was ruling in favor of the Board for reasons that it would state in a memorandum opinion.  This memorandum opinion was "to be issued" later.  Nevertheless, the court issued a second order on September 20, 2012, explaining that it would not be issuing a memorandum opinion.  The Foundation appeals from this second order.

## ANALYSIS

### I. THRESHOLD ISSUES:  TIMELINESS OF THE APPEAL AND THE STANDING OF THE FOUNDATION TO BRING THIS APPEAL

Two threshold issues require my attention before I delve into the substance of the assignments of error.  First, the Board argues that we must dismiss the appeal as untimely.  Second, the Board contends that the Foundation lacks standing.  I address each contention in turn.

### A.  The Foundation timely appealed from a final order.

The parties presented argument to the circuit court on the petition for appeal in September of 2011.  On January 17, 2012, the circuit court issued the following order:

> This matter is before the Court on the Petition for Appeal
> filed by the Appellants.  For reasons stated in a Memorandum
> Opinion, to be issued by this Court, this Court finds the Appellants
> have not met their burden in establishing that the Virginia State
> Water Control Board had insufficient evidential support for its

- 7 -

> findings of fact, or in establishing that the Board violated Va. Code Ann. § 62.1-44.15:5(D) and other applicable laws and regulations. The Board decision to issue Virginia Water Protection Permit #00-1688 was neither arbitrary nor capricious and is hereby affirmed. The Petition is hereby dismissed.

The order is not styled "final order" and it does not contain a place for counsel to endorse or, alternatively, a waiver of counsel's signature pursuant to Rule 1:13.

On July 26, 2012, counsel for the Foundation wrote a letter to the court indicating that he had not received any communication from the court since the September argument. The letter also noted that counsel had "been regularly monitoring the Court's information system [on a monthly basis] and had seen no entries of any such ruling or order, until recently, when we noted that there was an entry on the system for an Order dated January 17, 2012." Counsel noted that, contrary to the court's order, no memorandum opinion had been sent to him, nor had one been filed in the court's electronic information system. Counsel asked the court to issue the memorandum opinion referenced in its order.

Following several telephone conferences, the court issued a second order on September 20, 2012. The court explained that it had planned to enter a second order on January 18, 2012, stating that it would, in fact, not issue a memorandum opinion. The January 18, 2012 order, the court stated, "had not been entered due to a mistake by the Court." The order then pursued two alternative approaches: first, the court assumed that the order of January 17, 2012 was not a final order until the issuance of a memorandum opinion, and, with that assumption in mind, stated that it was deciding not to issue a memorandum opinion, thereby making the January 17, 2012 order final. Alternatively, the court assumed that the order of January 17, 2012 was final, and invoked Code § 8.01-428(B) to correct this order to reflect that no memorandum opinion would be issued. The Foundation then filed its notice of appeal on October 19, 2012.

The Board argues that the order dated January 17, 2012 constituted a final order and that we must dismiss the appeal because the Foundation's notice of appeal was filed more than 30 days after that order. See Rule 5A:6. The Board points out that a memorandum or letter opinion is not required from a circuit court and, moreover, the circuit court ruled in favor of the Board and dismissed the case. For its part, the Foundation notes that the order was not final because, by its express terms, it contemplated the issuance of a memorandum opinion. I agree with the Foundation.

Ordinarily, appellate courts will defer to a trial court's interpretation of its own order. See, e.g., Fredericksburg Constr. Co. v. J.W. Wyne Excavating, Inc., 260 Va. 137, 144, 530 S.E.2d 148, 152 (2000). Here, however, the trial court did not determine whether the January 17, 2012 order was a final order. Accordingly, I review this question of law *de novo*.

Although Virginia jurisprudence contains a significant number of cases addressing what constitutes a final order, the issue before us is one of first impression. Summarizing its case law, the Supreme Court of Virginia has held that

> An order is final and appealable when it disposes of the whole subject, gives all the relief that is contemplated, and leaves nothing to be done in the case except to superintend ministerially the execution of the order. Conversely, an order is not final if further action is necessary in order to dispose of the entire subject matter.

Indiana Ins. Guar. Ass'n v. Gross, 268 Va. 220, 220, 598 S.E.2d 322, 322 (2004) (*per curiam*) (citations omitted). Although the January 17, 2012 order states that the case is dismissed and it rules in favor of the Board, the order expressly contemplates that further action is necessary to dispose of the case, namely, the issuance of a memorandum opinion. A memorandum opinion is a substantive event in the life of the case that guides the parties' ability to lodge appropriate objections, to ask for reconsideration in the limited circumstances where reconsideration is warranted, and, should the case be appealed, affords the appellate court a controlling explanation of the trial court's reasoning.

As a general proposition, a circuit court is not required to issue a memorandum opinion.[4] Moreover, an oral statement from the bench that a memorandum opinion is forthcoming does not affect the finality of a written order. As the Supreme Court has often observed, "[i]t is the firmly established law of this Commonwealth that a trial court speaks only through its written orders." Davis v. Mullins, 251 Va. 141, 148, 466 S.E.2d 90, 94 (1996). But, where the court *does* indicate in a written order that it will issue a memorandum opinion explaining the basis for its decision, such an order is not final until the court has issued the memorandum opinion, along with a final order or, as here, issues an order stating that it will not issue a memorandum opinion. A contrary interpretation would create a formidable procedural trap for attorneys. Counsel should be entitled to rely upon the written representation of the court about a memorandum opinion without risking dismissal of their case on appeal.

The Board relies on Johnson v. Woodard, 281 Va. 403, 409, 707 S.E.2d 325, 328 (2011). There, the Supreme Court held that for a trial court "to reconsider the judgment or to address other matters still pending in the action before it," the court must expressly provide that it retains jurisdiction. Id. The order in Johnson granted a nonsuit and further provided that "for purposes of Rule 1:1, this is not a final order, in that this Court shall retain jurisdiction of this matter to consider any application for attorney's fees and costs and such other relief as may be sought." Id. The Supreme Court held that the language of this order was appropriate to retain jurisdiction and to enable the circuit court to consider whether to award attorney's fees, costs, and sanctions. The order in Johnson indisputably constituted a final order – it granted a nonsuit, thus ending the case – but by explicitly retaining jurisdiction, the court obviated the application of Rule 1:1. A precondition for

_____

[4] In some circumstances, the General Assembly expressly has required trial courts to provide an explanation for a decision. See, e.g., Code § 20-107.1 (requiring "written findings and conclusions of the court" in ordering spousal support); Code § 8.01-654(B)(5) (requiring "findings of fact and conclusions of law" in habeas cases).

the application of Rule 1:1 is the entry of a final order, one that "leaves nothing to be done." Johnson did not consider a situation where a trial court has expressly provided in a written order that it will issue a memorandum opinion explaining the basis for its decision. Johnson, therefore, is distinguishable because it involved entry of a final judgment that the court suspended in order to consider collateral matters. The January 17, 2012 order at issue here, in contrast, was not a final order, because by its express terms it left something substantive to be done. Therefore, the court was not required to provide that it was retaining jurisdiction.

Carrithers v. Harrah, 60 Va. App. 69, 74, 723 S.E.2d 638, 640 (2012), illustrates this distinction. There, we held that an order that disposed of the merits of the case but reserved jurisdiction over attorney's fees and costs was nevertheless a final order, and that the failure of the trial court to reserve jurisdiction foreclosed it from reopening the case more than 21 days after entry of the order.[5] Unlike collateral matters of attorney's fees and costs, a memorandum opinion gives shape and meaning to the final judgment of the court and constitutes a substantive rather than a collateral step with regard to the merits of the case.

Our jurisprudence seeks to strike an appropriate balance between, on the one hand, finality and fairness to the parties and to the trial court with, on the other hand, the need to protect a right to appellate review. No rule of court or precedent controls this specific situation. Moreover, "it must be remembered that the [law governing finality of judgments] is designed to simplify and make certain the matter of appealability. It is not designed as a trap . . . . The [law] should be interpreted to prevent loss of the right of appeal, not to facilitate loss." Bankers Trust Co. v. Mallis, 435 U.S. 381, 386 (1977) (citation omitted). I would hold that the appeal is properly before us, and I would deny the Board's motion to dismiss.

---

[5] The United States Supreme Court reached the same conclusion in Budnich v. Becton Dickinson & Co., 486 U.S. 196 (1988) (holding that a decision on the merits is a "final decision"

- 11 -

B. This Court's previous rejections of the Board's arguments that the Foundation lacks standing dispose of the Board's renewed challenge to the Foundation's standing.

In two previous appeals, we rejected the Board's argument that the Foundation lacks standing to challenge the issuance of the permit. In the first appeal, we held that Virginia law recognizes the concept of representational standing and we reversed and remanded the case for further factual determinations. Chesapeake Bay Foundation, Inc. v. Commonwealth ex. rel. Va. Water Control Bd., 46 Va. App. 104, 118, 616 S.E.2d 39, 46 (2005). In the second appeal, we held that the Foundation, in fact, had standing to challenge the permit at issue here. Chesapeake Bay Foundation, Inc. v. Commonwealth ex. rel. Va. Water Control Bd., 56 Va. App. 546, 556, 695 S.E.2d 549, 555 (2010). For the third time, the Board challenges the Foundation's standing to bring this suit. Controlling precedent requires us to hold that the Board has struck out.

To the extent the Board urges a panel of this Court to overturn a previous decision of a different panel of this Court, we are precluded from doing so under the interpanel accord doctrine. As the Supreme Court has explained, "a decision of a panel of the Court of Appeals becomes a predicate for application of the doctrine of *stare decisis* until overruled by a decision of the Court of Appeals sitting *en banc* or by a decision of this Court." Johnson v. Commonwealth, 252 Va. 425, 430, 478 S.E.2d 539, 541 (1996). To the extent the Board presses new arguments not advanced in the previous appeals, those arguments are barred by the doctrine of the "law of the case":

> Where there have been two appeals in the same case, between the same parties, and the facts are the same, nothing decided on the first appeal can be reexamined on a second appeal. . . . It differs from *res judicata* in that the conclusiveness of the first judgment is not dependent upon its finality.

as a matter of federal law when the recoverability or amount of attorney's fees for the litigation remains to be determined).

- 12 -

American Filtrona Co. v. Hanford, 16 Va. App. 159, 164, 428 S.E.2d 511, 514 (1993). Our previous decision that the Foundation has standing to pursue this appeal disposes of the Board's contention. Consequently, I would deny the Board's attempt to revisit the issue.

II. THE RECORD ESTABLISHES THAT THE BOARD MADE THE DETERMINATIONS REQUIRED BY STATUTE AND MADE THEM IN A MANNER THAT REFLECTS SUBSTANTIVE CONSIDERATION OF THE APPLICABLE LAWS.

Relying on Browning-Ferris Indus. v. Residents Involved in Saving the Env't, 254 Va. 278, 492 S.E.2d 431 (1997), the Foundation argues that the Board failed to make the determinations required by statute, or failed to make them with the required level of specificity. We review this legal question de novo. Amin v. County of Henrico, 286 Va. 231, 235, 749 S.E.2d 169, 170 (2013).

In Browning-Ferris, the Supreme Court examined whether the Director of the DEQ followed the requirements set by statute in issuing a permit for a new solid waste management facility. Id. at 280, 492 S.E.2d at 432. Code § 10.1-1408.1(D) required the Director to make an explicit determination that the proposed facility poses "no substantial present or potential danger to human health or the environment." After the Director issued the permit, an organization of persons residing near or owning property near the proposed landfill challenged the permit. Among other things, the challengers argued the Director never made the explicit determination required by Code § 10.1-1408.1(D). The Supreme Court found that the statute was unambiguous and that the Director failed to make the required determination. The Court rejected the argument that the Director could be deemed to have made an "implicit" determination. Instead, the Court held, the Director must make an explicit determination that must appear on the face of the agency record. Id. at 285, 492 S.E.2d at 435. The Court further found that Code § 10.1-1408.1(D) did not require that the Director's finding be reduced to writing and, therefore, it could be preserved in the agency record in a recorded or written format. Finally, the Court held that

> The Director's determination must be made with a degree of
> particularity that demonstrates a substantive consideration of the

- 13 -

statutory factors. A conclusional recitation of the statutory language or a statement that the Director complied with the statute is insufficient to satisfy this statutory mandate. The analysis which the Director employs in considering the statutory factors is a matter submitted to his discretion and expertise under the statutory scheme.

Id.

The Foundation contends that the Board failed to make an "explicit and substantiated" determination as to (1) the proposed project's compliance with the Clean Water Act; and (2) the effects of the cumulative impact to wetlands from the proposed project and other existing or proposed projects. I will address each contention in turn.

A. Clean Water Act compliance

Code § 62.1-44.15:20(B), formerly Code § 62.1-44.15:5(B), provides that the Board shall issue a permit if it has "determined that the proposed activity is consistent with the provisions of the Clean Water Act and the State Water Control Law and will protect instream beneficial uses." The "Fact Sheet" issued by the Board expressly provides that the "proposed activity is consistent with the provisions of the Clean Water Act . . . ." The Foundation contends that this notation is not sufficient under Browning-Ferris. It argues that "[t]here is no mention in either the Permit or its Fact Sheet of how the Permit purportedly complies with the Clean Water Act, what the Board considered to make that conclusory assertion, or how it arrived at that conclusion." The Board counters that the record shows that it considered the requirements of the Clean Water Act. I agree with the Board.

First, I note that in Browning-Ferris, the Director of the DEQ never referenced the applicable statute in his decision to issue the permit. Therefore, there is no claim in this case, as there was in Browning-Ferris, that the Board made an *implicit* determination of compliance with the Clean Water Act. Here, the Board's determination is quite express.

- 14 -

Second, as the Board points out, the requirements of the Clean Water Act with regard to avoidance, minimization, and mitigation are substantively the same as the requirements of the state water control law. See 40 C.F.R. § 230.10 (setting forth the practicable alternative guidelines for a § 404 permit obtained under the Clean Water Act) and 9 Va. Admin. Code § 25-210-115 (setting forth Virginia's alternatives analysis requirements). Given these overlapping requirements, I would reject the Foundation's formalistic argument that the Board must indicate which statutory scheme it was considering when determining whether an application for a permit satisfies the avoidance, minimization, and mitigation requirements of state and federal law.

Third, and most crucially, the administrative record here is replete with the Board's substantive consideration of state and federal legal requirements. First, the Board received extensive public comments at multiple hearings. The Board also received a large volume of written comments by interested parties and the DEQ. The record reflects that the Board considered these comments. Finally, the Board's substantive consideration of legal requirements is also made manifest by the repeated significant revisions to Tri-City's application and the detailed conditions imposed in the written permit itself. Browning-Ferris does not require that the Board's decision be reduced to writing. It requires that the record reflect the Board's "substantive consideration" of statutory requirements. Browning-Ferris, 254 Va. at 285, 492 S.E.2d at 435. This record abundantly reflects such consideration by the Board.

B. The Board's cumulative-impacts analysis

The Code specifies that "[a] permit shall be issued only if the Board finds that the effect of the impact, together with other existing or proposed impacts to wetlands, will not cause or contribute to a significant impairment of state waters or fish and wildlife resources." Code § 62.1-44.15:21(A) (formerly Code § 62.1-44.15:5(D)). The Foundation faults the DEQ for looking only at permit applications that are "in-house," *i.e*. those that have been submitted to the Board for

- 15 -

review.  The Foundation argues that the law "provides no exception for proposed impacts that are not 'in house' in the form of a pending, formal permit application."  According to the Foundation, "[b]oth [the] DEQ and the Board had before them more than sufficient information about proposed future projects that required a thorough and proper cumulative-impacts analysis."  I disagree with the Foundation.

I begin with the statutory language.  Code § 62.1-44.15:21(A) requires the Board to consider "existing or proposed impacts" in addition to the impact of the proposal pending before the Board.  Obviously, future projects are not "existing" projects.  The question then is whether the record establishes any "proposed" projects.  I understand the plain language meaning of the word "proposed" to mean something more than a desire for future development.  The word "proposed," in this context, means "to offer for consideration, discussion, acceptance, or adoption."  Webster's Third New International Dictionary 1819 (1981).  The record reflects that Tri-City anticipates future development.  What type of development that might be, however, is not clear.

For example, the Foundation points to a map that shows a road that connects the parcel currently under consideration to the adjoining parcel.  The Foundation argued this is not a "road to nowhere," that the existence of the road unmistakably indicates future development.  The Foundation also produced a map that suggests future development, and argued that a nearby "borrow pit" could have an impact.[6]  The map in question does not indicate any specific type of development.  The record certainly supports the Foundation's assertion that Tri-City plans to develop the adjoining parcel in the future.  The intent to develop an adjoining parcel in the future, however, does not constitute a "proposed" development within the intendment of the statute.  And

_____

[6] Tri-City argues in response that the road in question, the Plantation Woods Parkway, is a longstanding part of the master road plan for Chesapeake.  Tri-City also disputed that it was building a "borrow pit" nearby for use in *this* project.  It argued that the borrow pit is not tied to this permit or this project.  Instead, Tri-City stated that it contemplates using the pit elsewhere, "in major planned road projects in the Tidewater area in the future."

- 16 -

this points to a major difficulty with the Foundation's argument. Absent a concrete proposal showing the type of development that is contemplated, there is no way for the DEQ or the Board to anticipate the impact such future development might have. Indeed, the project under review illustrates the flexibility of the real estate market. Although the parcels comprising the subject property were purchased beginning in 1985, and were purchased from the outset with a view to developing a master-planned community, the property was not developed until much later due to market demand, the condition of the economy, interest rates, costs of construction, and other variables. Economic conditions fluctuate, consumer tastes evolve, and regulatory requirements change. All of this means that an intended project may never come to fruition or may come to fruition in a condition significantly altered from the original conception. For the DEQ and the Board to be able to identify the impact of such future development, there must be something concrete and specific to evaluate. An intention to develop real estate in the future is not a "proposed" impact.[7]

### III. THE CORPS' WETLANDS DELINEATION IS NOT CONTROLLING BECAUSE IT WAS MADE AFTER THE BOARD ISSUED THE PERMIT.

Code § 62.1-44.15:21(C) provides that "[a]ny delineation accepted by the U.S. Army Corps of Engineers as sufficient for its exercise of jurisdiction pursuant to § 404 of the Clean Water Act shall be determinative of the geographic area of that delineated wetland." The Foundation points to this sentence as being dispositive. It reasons that the Corps' delineation is "determinative," and because it varies from the delineation used to evaluate the permit, the Board must now vacate the permit and reexamine the entire application. This contention presents a

---

[7] I agree with the Foundation insofar as it argues that the statute does not require the "proposed impact" to emanate from a proposal that is filed "in house" with the DEQ. A concrete proposal for development that is pending before the Corps or a local government, for example, can be evaluated for its impact, whether or not the proposal has been filed "in house" with the DEQ or the Board.

- 17 -

question of statutory interpretation, which we review *de novo*.  Va. Dep't of Health v. NRV Real Estate L.L.C., 278 Va. 181, 185, 677 S.E.2d 276, 278 (2009).

Settled legal principles guide my construction of this statute.  "In construing statutes, courts are charged with ascertaining and giving effect to the intent of the legislature."  Crown Cent. Petroleum Corp. v. Hill, 254 Va. 88, 91, 488 S.E.2d 345, 346 (1997).  "A cardinal rule of statutory construction is that a statute be construed from its four corners and not by singling out a particular word or phrase."  Commonwealth Nat. Res., Inc. v. Commonwealth, 219 Va. 529, 536, 248 S.E.2d 791, 795 (1978).  In addition, "[t]he doctrine of *pari materia* teaches that statutes are not to be considered as isolated fragments of law, but as a whole, or as parts of a great, connected homogenous system, or a simple and complete statutory arrangement."  Commonwealth v. Wallace, 29 Va. App. 228, 234, 511 S.E.2d 423, 425 (1999) (quoting Moreno v. Moreno, 24 Va. App. 190, 197, 480 S.E.2d 792, 796 (1997)) (internal quotations omitted).

Virginia law contains a number of other provisions that are germane to the resolution of this issue.  First, the Code imposes a number of deadlines for the Board to act.  The Board must, "[w]ithin 120 days of receipt of a complete application," either "issue the permit, issue the permit with conditions, deny the permit, or decide to conduct a public meeting or hearing."  Code § 62.1-44.15:21(E).  If the Board decides to hold a public meeting or hearing, it must do so "within 60 days of the decision to conduct such a proceeding."  Id.  Following the hearing, the Board must make "a final decision as to the permit . . . within 90 days of completion of the public meeting or hearing."  Id.  The General Assembly thus manifested its intent that permits should be acted upon with some dispatch.  The Foundation's position – that a new wetlands delineation by the Corps at any time must control, even if issued years after action by the Board – runs counter to the legislative command of timely action.

This case illustrates the stark consequence of such a position. According to the Foundation, the parties must start over from square one, after numerous hearings by the Board and more than a decade of litigation. I find it hard to believe that the General Assembly intended such a colossal waste of resources by the parties, by the state administrative agencies, and by the judiciary.

The Code further provides – in the same section that contains the sentence the Foundation relies upon, no less – that "[a]ny such approval of a delineation shall remain effective for a period of five years; however, if the Board issues a permit pursuant to this article for an activity in the delineated wetland within the five-year period, *the approval shall remain effective for the term of the permit.*" Code § 62.1-44.15:21(C) (emphasis added).[8] The Foundation's interpretation would mean that the Board's approval would not, in fact, remain effective for the term of the permit. Instead, the approval of a delineation would remain effective until the Corps makes a different delineation, even if that occurs long after the Board has issued a permit.

Finally, wetland boundaries are not static. They can change based on natural activity. To impose additional delay on the issuance of a permit based on this natural cycle would further erode the time constraints the General Assembly has imposed on the Board and incentivize delaying tactics at the state level in order to prompt a new designation by the Corps – one that would then, according to the Foundation, require the Board to start all over again. I do not think the General Assembly intended such a cumbersome and impractical statutory scheme.

Insofar as the Foundation argues that the Board conceded this issue, I disagree. The Board recognized, as a practical matter, if the Corps imposes more stringent conditions on the issuance of a permit, the most restrictive conditions control. This practical recognition of the realities of a dual

___

[8] Although the Board may modify a permit, as Judge Petty notes, this specific language controls with regard to the delineation of wetlands.

permitting scheme does not constitute a legal concession by the Board that a new wetlands

delineation by the Corps requires the Board to vacate a permit it has issued.[9]

When the General Assembly created a state permitting regime that is similar but not

identical to the federal permitting regime, it created the possibility that state and federal agencies

would ultimately differ on permitting requirements. That is an inescapable fact of such a permitting

scheme. Moreover, Tri-City must still satisfy federal permitting requirements and must

accommodate the wetlands delineation made by the Corps.

Interpreting as a whole the words of the statute, I would hold that the Corps' wetlands

delineation is controlling over a contrary delineation until a permit has issued. Once it has issued,

the permit remains valid for its stated term, regardless of a subsequent revised delineation by the

Corps.

IV. THE BOARD'S ACTIONS SATISFY THE STRICTURES OF THE STATE WATER CONTROL LAW.

Judicial review of agency decisions is limited. See Code § 2.2-4027. Our purview here is to

ensure that the agency (1) acted in accordance with the law, (2) did not make any significant

procedural error; and (3) had sufficient evidential support for its findings of fact.

Commonwealth ex rel. Va. State Water Control Bd. v. Blue Ridge Envt'l Def. League, 56

Va. App. 469, 480, 694 S.E.2d 290, 296 (2010).

With regard to factual issues, the task before us is to determine "'whether substantial

evidence exists in the agency record to support the agency's decision. The reviewing court may

reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind

would necessarily come to a different conclusion.'" John Doe v. Virginia Bd. of Dentistry, 52

---

[9] This conclusion disposes of the Foundation's argument that the circuit court erred in refusing to remand the case to the Board based on the Corps' wetlands delineation. Whether the Corps grants or denies a permit pursuant to its own, separate permitting authority is irrelevant to the issue before the circuit court, namely, the legal correctness of the Board's decision to issue a permit.

Va. App. 166, 175, 662 S.E.2d 99, 103 (2008) (quoting Johnston-Willis, Ltd. v. Kenley, 6

Va. App. 231, 242, 369 S.E.2d 1, 7 (1988)).  This standard is designed "to give great stability

and finality to the fact-findings of an administrative agency."  Virginia Real Estate Commission

v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983).  As a general proposition, we review the

agency's legal conclusions *de novo*.  Code § 2.2-4027.

The Foundation argues that

> The Board and [the] DEQ failed to apply the required hierarchical
> avoidance/minimization/compensation analysis, failed to require
> Tri-City to explore practicable alternatives, failed to require Tri-City
> to show that its proposed project was the least damaging alternative,
> and instead bypassed directly to compensation.

### A.  Statutory and regulatory obligations

The General Assembly of Virginia enacted the State Water Control Law with a view to

> (1) protect existing high quality state waters and restore all other
> state waters to such condition of quality that any such waters will
> permit all reasonable public uses and will support the propagation
> and growth of all aquatic life, including game fish, which might
> reasonably be expected to inhabit them; (2) safeguard the clean
> waters of the Commonwealth from pollution; (3) prevent any
> increase in pollution; (4) reduce existing pollution; (5) promote
> and encourage the reclamation and reuse of wastewater in a
> manner protective of the environment and public health; and
> (6) promote water resource conservation, management and
> distribution, and encourage water consumption reduction in order
> to provide for the health, safety, and welfare of the present and
> future citizens of the Commonwealth.

Code § 62.1-44.2.

The State Water Control Law defines "wetlands" as

> [T]hose areas that are inundated or saturated by surface or
> groundwater at a frequency and duration sufficient to support, and
> that under normal circumstances do support, a prevalence of
> vegetation typically adapted for life in saturated soil conditions.
> Wetlands generally include swamps, marshes, bogs and similar
> areas.

Code § 62.1-44.3.

The Water Control Law requires anyone seeking to fill or drain wetlands to obtain a Virginia Water Protection permit. Code § 62.1-44.15:20(A). Prior to issuing a permit, the State Water Control Board must find that "the proposed activity is consistent with the provisions of the Clean Water Act and the State Water Control Law and will protect instream beneficial uses." Code § 62.1-44.15:20(B). In addition, a permit can "be issued only if the Board finds that the effect of the impact, together with other existing or proposed impacts to wetlands, will not cause or contribute to a significant impairment of state waters or fish and wildlife resources." Code § 62.1-44.15:21(A).

A permit also must "address avoidance and minimization of wetland impacts to the maximum extent practicable." Id. Furthermore, "permits shall contain requirements for compensating impacts on wetlands. Such compensation requirements shall be sufficient to achieve no net loss of existing wetland acreage and functions." Code § 62.1-44.15:21(B). Regulations additionally provide that

> For all proposed projects, the applicant shall demonstrate to the satisfaction of the board that avoidance and minimization opportunities have been identified and applied to the proposed activity, that practicable alternatives, including design alternatives, have been evaluated for the proposed activity, and that the proposed activity, in terms of impacts to water quality and fish and wildlife resources, is the least environmentally damaging practicable alternative.

9 Va. Admin. Code § 25-210-115(C). The regulation further specifies that

> 1. Avoidance and minimization includes, but is not limited to, steps taken in accordance with the Guideline for Specification of Disposal Sites for Dredged or Fill Material, 40 CFR Part 230 (Federal Register, December 24, 1980) to first avoid and then minimize adverse impacts to surface waters to the maximum extent practicable. Measures, such as reducing the size, scope, configuration, or density of the proposed project, that would avoid or result in less adverse impact to surface waters shall be considered to the maximum extent practicable.

Id.  A guidance memorandum issued by the DEQ explains that for the type of project at issue here,

> [T]he applicant must clearly demonstrate that there are no other practicable alternatives to the proposed impacts.  VWPP project managers should explore other practicable factors (i.e. design changes, siting changes, project reconfiguration, different construction practices, etc.) that first avoid the proposed impact, then minimize those unavoidable impacts.

The Foundation also cites federal guidelines and regulations to the same effect.

Neither the Code nor the regulations compel avoidance or minimization at all costs.  Such minimization and avoidance must occur where "practicable."  This term is defined as "available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes."  9 Va. Admin. Code § 25-210-10.  A guidance memorandum issued by the DEQ in 2004 provides that "to be practicable, an alternative must be both available to the permit applicant and capable of fulfilling the overall project purpose."

B.  The record establishes that the Board considered and rejected alternatives.

I now turn to the Foundation's claim that the "record is wholly devoid of the required alternatives analysis."  First, with regard to available alternative sites, the Board found persuasive Tri-City's contention that

> No other sites exist in the area that could satisfy the project purpose of providing nearby residential development and related services to the rapidly expanding commerce and employment center located around the Interstate 64 and Greenbrier Parkway interchange, and have less impact to wetlands.

I am unable to find any indication in the record of a viable alternative site.

Tri-City did not produce – and the Board did not require it to produce – a folder full of alternative plans for the Board to choose from.  What transpired instead was an ongoing negotiation during the course of which Tri-City made extensive revisions to its original plan – revisions made at the prodding of the Board and the DEQ.  Tri-City moved a road, relocated a school off-site,

expanded a buffer, moved some of the single-family homes, and installed elaborate stormwater protection measures to minimize the impact on wetlands. The original project was significantly reworked to minimize wetlands impacts. Therefore, the Board plainly did not ignore avoidance and minimization measures and did, in fact, require alternatives from Tri-City.

The record also reflects the fact that the Foundation offered several alternative designs of the parcel at issue and that the Board considered these alternatives. The Board rejected these alternatives. One obstacle to the redesigns proposed by the Foundation is that these redesigns would require additional rezoning by the City of Chesapeake, which did not favor the redesign. In addition, the Board heard testimony that the Foundation's proposed alternative of clustering the lots on small parcels would have a substantial adverse impact on the economics of the project because the sales price of the lots would be substantially reduced. Tri-City submitted an analysis indicating that the Foundation's alternative of "[r]ow town-homes" constitutes an "outdated development concept." One of the alternatives would result, according to the City of Chesapeake, in a $117,760,000 reduction of the overall property value of the project. Another alternative scenario proposed by the Foundation involved removing the project's proposed commercial components. Tri-City contended that this alternative was not practicable economically. The City of Chesapeake also noted that this alternative would not only dramatically reduce the value of the project but also defeat the purpose of a mixed-use development, which is "to bring together a variety of community activities, amenities and services in close proximity, thereby reducing the need for extensive automobile travel and promoting increased personal interaction."

By law, the Board also had to consider avoidance and minimization measures that are "practicable," *i.e.* "available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes." 9 Va. Admin. Code § 25-210-10. The overall project purpose was to build a master-planned, mixed-use development

- 24 -

that would supply housing and services to the Greenbrier area of Chesapeake. Tri-City offered evidence to show that it, or its related predecessors, had spent in excess of $15 million to acquire the land that was combined to form the parcel at issue. The record establishes that the Board considered a variety of alternative measures, including ones that would reduce "the size, scope, configuration, or density of the proposed project." 9 Va. Admin. Code § 25-210-115(C)(1).

### C. The record supports the Board's alternatives analysis.

The Foundation further argues that the Board's practicability analysis was flawed because it accepted Tri-City's economic analyses "without scrutiny." The record refutes this characterization. After Tri-City provided the Board with a variety of evidence regarding its costs, as well as a marketing review of the site, members of the Board questioned both the Foundation's counsel and counsel for Tri-City about the numbers provided. The Board also asked questions concerning written comments provided by the Foundation. The record thus reflects that the Board did scrutinize the economic analyses.

The Foundation challenges Tri-City's estimates of its cost, noting that much of the land initially was purchased by other corporate entities, evidenced by the fact that Tri-City was not even formed as a corporate entity until 1998. The Board is required to consider the "cost" in determining what alternatives are "practicable." 9 Va. Admin. Code § 25-210-10. The regulation does not confine the "cost" to the entity applying for the permit. Importantly, the record establishes that all of the entities were related[10] and there is no dispute that the purchases of land were all made with a view to creating a master-planned community to serve the Greenbrier area of Chesapeake. I discern no reason why the Board should exclude predecessor, *but related*, entities from the

---

[10] Tri-City represented that these predecessor entities (E.S.G. Enterprises, Inc., Aqua Sports, Inc., and TransAmerica Services, Inc.,) were owned by principals of Tri-City and that the transfers of property from these other entities to Tri-City was made for corporate and estate planning reasons.

"cost" analysis where those related entities shared the same investment-backed expectations from the beginning. The point of the practicability analysis is to take into account the applicant's investment-backed expectations, not to straightjacket developers into one particular corporate structure.[11]

D. I would reject the Foundation's remaining arguments.

The Foundation also highlights language in a memorandum dated February 25, 2003, in which the DEQ staff stated that it "believe[d] that the mitigation proposed in the applicant's conceptual mitigation plan has potential for providing acceptable compensation that will result in no net loss of wetland function." It is not enough, the Foundation argues, to have a "belief" that a mitigation plan has the "potential" to provide the necessary compensation. At the time this memorandum was prepared, however, the DEQ staff were still working with the applicant to secure additional compensation sites. The memorandum concludes that additional details would be presented at the Board's upcoming meeting. At the Board's final meeting in October of 2003, the DEQ staff stated without ambiguity that the 145 acres on the adjacent property that are preserved in perpetuity, as well as the carefully selected 290 acres of restored wetlands, would not only ensure no net loss of wetlands but would actually result in a net *gain* of wetlands.

Finally, the Foundation stresses the Corps' rejection of Tri-City's permit application, as well as the arguments it made in opposition to the permit. Certainly, the Corps laid out in carefully considered detail its reasoning for rejecting a permit. However, the Corps' decision with regard to a federal permit is not controlling over the state's separate permitting authority. Additionally, as the United States Supreme Court has persuasively observed, "the possibility of drawing two

---

[11] This would hold true in the inverse scenario, that is, a related/successor corporation who purchases the property at an artificially inflated price in order to increase its costs and thereby truncate the practicability analysis. Such an artificial inflation of costs would not reflect the true costs of the applicant. By the same token, an artificially low purchase price by the

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Our role as a reviewing court is neither to evaluate the wisdom of the Board's decision, nor to substitute our judgment for that of the Board.  My review of this record, under the deferential standard we must apply, compels me to conclude that substantial evidence exists in the record to support the Board's decision.

## CONCLUSION

The decision of the circuit court is affirmed.

Affirmed.

---

applicant from a related corporation does not reflect the broader investment-backed expectations of the related entities that purchased the land.

Petty, J., concurring in part and dissenting in part.

I join in Section I of Judge McCullough's opinion and agree that we have jurisdiction to hear this appeal and that the Foundation has standing to pursue it. However, because I believe that this matter must be remanded to the Board for further consideration in light of the Army Corps of Engineers (the Corps) increased delineation of the acreage of wetlands affected, I dissent from the remainder of his opinion.

The decision of the State Water Control Board (SWCB) in this case has spawned over a decade of litigation, three appearances before this Court, and an appendix of over two thousand pages. While the procedural history of this saga is sometimes obfuscated by bureaucratic jargon, it appears that the genesis of the controversy goes back to 1989 when the City Council for the City of Chesapeake rezoned the property for commercial and residential development. In 1994, an initial wetlands assessment determined that much of the property consisted of wetlands. Four years later, Environmental Specialties Group, Inc., a different wetland consultant representing Tri-City, conducted an assessment and determined that only a small portion of the property consisted of wetlands. The Corps rejected this assessment and, in 1999, Environmental Specialties re-examined the property and concluded that most of the area, including the property that is part of this permit, consisted of wetlands. App. at 177.

In September 2000, Tri-City applied for a permit from the SWCB to allow it to proceed with the development of the property. In December 2001, a review request letter and copy of the permit application were mailed to the Corps by the SWCB. Because the Corps was asserting its jurisdiction under Section 404 of the Clean Water Act, it began processing the application for a concurrent federal permit. According to the SWCB, on August 9, 2002, the federal permit processes was terminated due to "insufficient response from the applicant." App. at 476.

In November 2003, the SWCB issued the permit involved in this appeal to Tri-City to develop 144.6 acres of forested wetlands. On January 21, 2005, Tri-City re-submitted an application involving the same development proposal approved by the SWCB to the Corps. This proposal involved the development of the 144.6 acres of wetlands. In March 2005, the Corps determined that the wetlands delineation was inaccurate and, in January 2007, a wetlands delineation adding an additional 36.7 acres was issued by the Corps. The Corps concluded that a total of 181.3 acres of wetlands would be affected by the project, a 25% increase over the delineation contained in the state permit. App. at 177-78.[12]

Code § 62.1-44.15:21(C) (originally enacted as Code § 62.1-44.15:5(D)) provides, in pertinent part, that "[a]ny delineation accepted by the U.S. Army Corps of Engineers as sufficient for its exercise of jurisdiction pursuant to § 404 of the Clean Water Act shall be determinative of the geographic area of that delineated wetland." Further, prior to issuing a permit, the SWCB must determine that "the proposed activity is consistent with the provisions of the Clean Water Act . . . ." Code § 62.1-44.15:20(B) (originally enacted as Code § 62.1-44.15:5(B)). The plain language of these statutes provides a clear and unambiguous statement that the General Assembly intended to follow the requirements of the federal Clean Water Act when issuing permits for the development of wetlands. Thus, as both parties concede, the scope of the state permit cannot exceed the scope of a required federal permit.

Judge McCullough's opinion recognizes this, but concludes that Code § 62.1-44.15:21(C) does not apply once the permit is issued. I disagree with this conclusion for two reasons. First, it would allow a permit applicant to deliberately circumvent Code § 62.1-44.15:21(C) by timing his applications. That is exactly what occurred here. The initial federal permit process was

_____

[12] In March 2008, the Corps denied the application for a federal permit. This action was upheld on appeal and, from this appendix, appears to be a final decision by the Corps. It is

initiated when the SWCB forwarded the state permit application to the Corps. Apparently

recognizing that the Corps had already determined the acreage of affected wetlands was greater

than delineated in the state application, Tri-City effectively terminated the federal review by

failing to respond to inquiries by the Corps. Only after the SWCB had issued the state permit did

Tri-City apply for a federal permit in its own right.

The second disagreement I have with Judge McCullough's analysis of this issue is his

apparent conclusion that once a permit is issued, the delineation of wetlands, and thus the scope

of the project, is cast in stone. I believe that this view ignores the SWCB's authority to modify a

permit in this situation. SWCB Regulation 9 VAC 25-210-180 provides express authority for the

SWCB to modify a permit. Grounds for modifying a permit include:

> 1. When additions or alterations have been made to the affected
> facility or activity that require the application of VWP permit
> conditions that differ from those of the existing VWP permit or are
> absent from it;
>
> 2. When information becomes available about the operation of
> activity covered by the VWP permit that was not available at VWP
> permit issuance and would have justified the application of
> different VWP permit conditions at the time of VWP permit
> issuance;
>
>        \*      \*      \*      \*      \*      \*      \*
>
> 5. When changes occur that are subject to "reopener clauses" in
> the VWP permit; . . . .

9 VAC 25-210-180.

Moreover, Tri-City's permit requires Tri-City to

> notify the DEQ of any *additional impacts* to surface waters,
> *including wetlands*, or any change to the type of wetlands impacts,
> associated with this project. Any additional impacts to surface
> waters, including wetlands, shall be subject to individual permit

---

ironic, therefore, that all the time and effort expended by the parties in this appeal may be for
naught; if the Corps is correct in its assertion of jurisdiction, this project is dead in the water.

> review or modification of this permit, and compensatory mitigation
> and/or site restoration may be required.

App. at 453 (emphases added).

Finally, the permit contains a "reopening clause":

> Cause for reopening VWP permits includes, but is not limited to
> when the circumstances on which the previous VWP permit was
> based have materially and substantially changed, or special studies
> conducted by the board or the permittee show material and
> substantial change, since the time the VWP permit was issued and
> thereby constitute cause for VWP permit modification or
> revocation and reissuance.

App. at 467.

The Corps wetlands delineation was issued while this case was pending on appeal before this Court. When we remanded the case back to the circuit court for further consideration, the Foundation filed a motion to remand it to the SWCB for reconsideration in light of the conflicting Corps wetlands delineation. The circuit court denied the motion. Because I believe that Code § 62.1-44.15:21(C) requires the SWCB to defer to the Corps' wetland delineation, and because I believe that the SWCB's regulations and the permit it issued allow for the reopening of that permit, I would reverse the circuit court and remand with directions to remand this matter back to the SWCB for further consideration.[13]

---

[13] In light of my conclusion that this matter should be remanded to the SWCB for reconsideration, I would not reach the additional assignments of error presented by the Foundation.

Chafin, J., dissenting.

I respectfully dissent from the majority's holding that this Court acquired active jurisdiction to consider the merits of appellants' case. I would hold that the circuit court's January 17, 2012 order was a final order rendering judgment for the purposes of Rule 1:1. Therefore, appellants' October 19, 2012 notice of appeal was not timely filed and we are without jurisdiction to consider the appeal. As such, I believe the appeal should be dismissed.

The circuit court's final order stated that

> the [a]ppellants have not met their burden in establishing that the Virginia State Water Control Board had insufficient evidential support for its findings of fact, or in establishing that the Board violated Va. Code Ann. § 62.1-44.15:5(D) and other applicable law and regulations. The Board decision to issue the Virginia Water Protection Permit #00-1688 was neither arbitrary nor capricious and is hereby affirmed. The Petition is hereby dismissed.

"It is the firmly established law of this Commonwealth that a trial court speaks only through its written orders." Davis v. Mullins, 251 Va. 141, 148, 466 S.E.2d 90, 94 (1996). Our Supreme Court has defined a "final order or decree" as "one that disposes of the entire matter before the court, giving all the relief contemplated and leaving nothing to be done by the court except the ministerial execution of the court's order or decree." McLane v. Vereen, 278 Va. 65, 70, 677 S.E.2d 294, 297 (2009). See also Comcast of Chesterfield County, Inc. v. Bd. of Supervisors, 277 Va. 293, 301, 672 S.E.2d 870, 873 (2009); Upper Occoquan Sewage Auth. v. Blake Constr. Co., 275 Va. 41, 60, 655 S.E.2d 10, 21 (2008); James v. James, 263 Va. 474, 481, 562 S.E.2d 133, 137 (2002); Daniels v. Truck & Equipment Corp., 205 Va. 579, 585, 139 S.E.2d 31, 35 (1964).

Even where an order granting final judgment expressly indicates that the trial court intends further action, "such language does not negate the fact that such an order is in fact a final judgment." Carrithers v. Harrah, 60 Va. App. 69, 74, 723 S.E.2d 638, 640 (2012). "The

- 32 -

Supreme Court has held that if a trial court wishes such an order not to be a final order, it must 'includ[e] specific language [in the order rendering judgment] stating that the court is retaining jurisdiction to address matters still pending before the court.'" Id. at 74-75, 723 S.E.2d at 640 (alteration in original) (quoting Johnson v. Woodard, 281 Va. 403, 409-10, 707 S.E.2d 325, 328 (2011)).

Rule 1:1 states in pertinent part: "All final judgments, orders, and decrees, irrespective of terms of court, shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer." "'[W]hen a trial court enters an order, or decree, in which a judgment is rendered for a party, unless that order expressly provides that the court retains jurisdiction to *reconsider the judgment* or to *address other matters still pending in the action before it*, the order renders a final judgment and the twenty-one day time period prescribed in Rule 1:1 begins to run.'" Johnson, 281 Va. at 409, 707 S.E.2d at 328 (emphases added) (quoting Super Fresh Food Mkts. of Va. v. Ruffin, 263 Va. 555, 561, 561 S.E.2d 734, 737 (2002)).

"[T]he running of the twenty-one day time period prescribed by Rule 1:1 may be interrupted only by the entry, within the twenty-one day time period, of an order modifying, vacating, or suspending the final judgment order." Burrell v. Commonwealth, 283 Va. 474, 478, 722 S.E.2d 272, 274 (2012) (quoting Super Fresh Food Mkts. of Va., 263 Va. at 560, 561 S.E.2d at 737). No such order was entered in this case.

Even though the circuit court contemplated a memorandum opinion to follow the January 17, 2012 order, the failure to issue one did not affect the finality of the dismissal order. The final order gave all the relief contemplated and left nothing to be done by the court. In fact, during the

July 2012 conference call between the circuit court and the parties, the circuit court acknowledged that a memorandum opinion was neither necessary nor required in this case.[14]

This Court has stated, in no uncertain terms, that "Code § 8.01-428(B) does not provide the trial court with authority to vacate and reenter a final decree for the sole purpose of extending the filing deadline upon realization that the parties were not timely notified of the decree's entry. The authority and procedure to extend the filing deadline, where lack of notice is the issue, is provided only under subsection (C)."[15] Zhou v. Zhou, 38 Va. App. 126, 136, 562 S.E.2d 336, 340 (2002).

---

[14] On September 10, 2012, counsel for appellants requested that the court "vacate the incorrect January 17 Order and enter a new order – with a new, current date – setting out that there will be no accompanying memorandum opinion" pursuant to Code § 8.01-428(B). On September 20, 2012, the circuit court issued an order "correcting" the January 17, 2012 order to reflect that a memorandum opinion stating the reasons for the underlying dismissal would not be filed, and reaffirming that the January 17, 2012 order was in fact a final order. "[C]ourts have the authority to interpret their own orders. Furthermore, when construing a lower court's order, a reviewing court should give deference to the interpretation adopted by the lower court." Rusty's Welding Serv., Inc. v. Gibson, 29 Va. App. 119, 129, 510 S.E.2d 255, 260 (1999) (*en banc*) (citations omitted). However, the interpretation needs to be reasonable and shall be reviewed with an abuse of discretion standard. Roe v. Commonwealth, 271 Va. 453, 458, 628 S.E.2d 526, 528 (2006) (citing Smoot v. Commonwealth, 37 Va. App. 495, 500, 559 S.E.2d 409, 412 (2002)).

[15] Six months after the court entered its final order, counsel for appellants notified counsel for appellees and the court that it allegedly never received a copy of the underlying order despite its purported persistent monitoring of the circuit court's electronic case information system. These allegations, even if true, are expressly addressed by Code § 8.01-428(C) and are furthermore insufficient to alter the fact that the time to appeal had expired.

According to Code § 8.01-428(C):

> If counsel, or a party not represented by counsel, who is not in default in a circuit court is not notified by any means of the entry of a final order and the circuit court is satisfied that such lack of notice (i) did not result from a failure to exercise due diligence on the part of that party and (ii) denied that party an opportunity to pursue post-trial relief in the circuit court or to file an appeal therefrom, the circuit court may, within 60 days of the entry of such order, modify, vacate, or suspend the order or grant the party leave to appeal. Where the circuit court grants the party leave to

Therefore, to the extent the September 20, 2012 order purports to extend the time to appeal, I would hold that it is a nullity.  See Burrell, 283 Va. at 480, 722 S.E.2d at 275. Judgment was final upon entry of the January 17, 2012 order, thus triggering appellants' opportunity to note an appeal to this Court.  Because appellants failed to file a notice of appeal within thirty days, I would hold that this Court lacks jurisdiction to hear the appeal.  See Rule 5A:6.

---

appeal, the computation of time for noting and perfecting an appeal shall run from the entry of such order, and such order shall have no other effect.

Neither appellants nor the court took any action within the additional time provided under this section's limited exception to Rule 1:1.